UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

TODD BENJAMIN INTERNATIONAL, LTD. and
TODD BENJAMIN, individually and on behalf of
all others similarly situated, and derivatively on
behalf of the TCA Global Credit Master Fund, L.P.,
TCA Global Credit Fund, LP, and TCA Global
Credit Fund, Ltd.,

      Plaintiffs,

vs.

TCA FUND MANAGEMENT GROUP CORP., a
Florida corporation, ROBERT PRESS, ALYCE
SCHREIBER, WILLIAM FICKLING, THOMAS
DAY, PATRICK PRIMAVERA, DONNA
SILVERMAN, and TARA ANTAL,

      Defendants.

Case No. _____

Class Action Complaint

**Jury Trial Demanded**

## VERIFIED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Todd Benjamin International, Ltd. and Todd Benjamin ("Plaintiffs"),

individually and behalf of all others similarly situated, and derivatively on behalf of the TCA

Global Credit Master Fund, L.P., TCA Global Credit Fund, LP, TCA Global Credit Fund, Ltd.,

sue Defendants, TCA Fund Management Group Corp. ("TCA Management"), Robert Press

("Press"), Alyce Schreiber ("Schreiber"), William Fickling ("Fickling"), Thomas Day ("Day"),

Donna Silverman ("Silverman"), Patrick Primavera ("Primavera"), and Tara Antal ("Antal")

(collectively, "Defendants"), alleging as follows:

## INTRODUCTION

Defendants are the investment advisor and certain officers and directors that advised a

series of Cayman-based hedge funds organized to pool investments. TCA Global Credit Master

Fund, L.P. ("Master Fund") serves as the primary fund for various TCA entities through a "master-feeder" fund structure.  That structure, discussed in more detail below, uses other funds to funnel money to the Master Fund in order to aggregate all funds in one place.  The Master Fund's supposed business was to make high-interest, collateralized loans to micro- and small-cap companies in need of short-term capital.

Plaintiffs bring this class action against the Defendants because Defendants knowingly inflated the net asset value ("NAV") of the Master Fund by, among other things, failing to remove or properly value bad loans and by creating phantom "investment advisory" fees that were fraudulent and uncollectable.  As a consequence of inflating the NAV with bad loans and phantom fees, Defendants were paid excessive management fees for advising the Master Fund and feeder funds as the SEC-registered investment advisor and its officers and directors, and redeemed investments in the TCA funds at excessive values, before the fund collapsed and entered a dissolution process on or about January 21, 2020.

Plaintiffs, being unaware of Defendants' fraudulent practice of inflating the NAV of the Master Fund, elected to invest in, and not redeem their respective investments in, the Master Fund.  The Master Fund, which reported assets in excess of $500 million, is now allegedly missing at least $200 million.  The claims asserted in this lawsuit are direct and derivative claims based on Defendants' misrepresentations and breach of related duties.

### THE PARTIES

1.      Plaintiff Todd Benjamin International, is a legal entity incorporated in the United Kingdom.

2.      Plaintiff Todd Benjamin, acting for the benefit of his IRA account, is a resident of the United Kingdom and a citizen of the Unites States.

3.      Defendant TCA Management is an SEC-registered investment advisor located in, and managed from, Aventura, Florida, and is incorporated under laws of the State of Florida. TCA Management was at all material times the SEC-registered investment manager of the Master Fund and other feeder funds, discussed below.

4.      Robert Press is the Founder and Director of the Master Fund and of TCA Management, and a resident of the State of Florida.  According to SEC-filed form ADV for TCA Management, TCA Management is controlled and majority owned by Robert Press.

5.      Alyce Schreiber is the acting Chief Executive Officer of TCA Management, and on information and belief, a resident of the State of Florida.

6.      William ("Bill") Fickling is the acting Chief Operating Officer of TCA Management, and on information and belief, a resident of the State of Georgia.

7.      Thomas Day is the acting Chief Credit Officer of TCA Management, and on information and belief, a resident of the State of New York.

8.      Donna Silverman is the former chief portfolio manager of TCA Management, and on information and belief, a resident of the State of Florida.

9.      Patrick Primavera is the former managing director of TCA Management, and on information and belief, a resident of the State of New Jersey.

10.     Tara Antel is the Chief Compliance Officer of TCA Management, and on information and belief, a resident of the State of Florida.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to federal question jurisdiction, 28 U.S.C. § 1331, and the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action and the amount in controversy exceeds $5 million,

exclusive of interest and costs, and Plaintiffs — as well as other class members — are citizens of different states than Defendants, who are residents of Florida, Georgia, New York, and New Jersey.  On information and belief, less than one-third of the members of the proposed class are citizens of the State of Florida, Georgia, New York, and/or New Jersey.  Indeed, TCA Management's disclosures indicate that approximately 90% of beneficial owners in the Master Fund are foreign citizens.

12.     The Court has personal jurisdiction over Defendants on the following grounds: TCA Management and the other Defendants operate the Master Fund in, maintain an office in, and reside in, Florida.  Defendants committed the tortious acts complained of herein within Florida.  Defendants are also engaged in substantial and not isolated activity within Florida.

13.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of Florida because Defendants reside in, and a substantial part of the events or omissions giving rise to the claims occurred in this District; specifically, in Aventura, Florida.

14.     Further, under the Offering Memorandum, any court of competent jurisdiction may hear these claims, which are subject to Delaware law.  Specifically, the Offering Memorandum provides in relevant part:

> Neither the General Partner nor the Investment Manager shall be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business of the Partnership unless such action or inaction is determined by a final, non-appealable court of competent jurisdiction to constitute gross negligence (as interpreted in accordance with the laws of the State of Delaware, U.S.) or willful misconduct. The Partnership (but not the Limited Partners) is obligated to indemnify the General Partner, the Investment Manager and their respective partners, managers, members, officers, employees and affiliates from any claim, loss, damage or expense incurred by such persons relating to the business of the Partnership; provided that such indemnity will not extend to conduct determined by a final, non-appealable court of competent jurisdiction to constitute gross negligence (as interpreted in accordance with the laws of the State of Delaware, U.S.) or willful misconduct. The Master Agreement contains similar exculpation and indemnification provisions in favor of the General Partner.

Exhibit 1 (emphasis supplied).

## SUMMARY

15.     TCA Management is an SEC-registered investment advisor that is majority owned and controlled by Press.

16.     The other individual Defendants are (or have been) officers and/or directors of TCA Management with direct responsibility over portions of TCA Management's advisory activities for the Master Fund and other TCA feeder funds.

17.     TCA Management provides investment advisory services to three pooled investment vehicles, according to SEC-filed ADV forms. Specifically, those pooled investment vehicles are:

      a. TCA Global Credit Fund, LP, which directly invest substantially all of its assets in the Master Fund and serves as the vehicle for investment in the Master Fund by foreign citizens;

      b. TCA Global Credit Fund, Ltd., which invests substantially all of its assets in the Master Fund through TCA Global Lending Corp., and serves as the vehicle for investments in the Master Fund by U.S. citizens; and

      c. TCA Global Credit Master Fund, LP (i.e., the "Master Fund"), which is used to pool all assets invested by U.S.-based and foreign-based investors from the two feeder funds.

18.     In summary, the first two funds, TCA Global Credit Fund, L.P. and TCA Global Credit Fund, Ltd. (collectively "Feeder Funds"), feed investments into the Master Fund, which is used for short term, senior secured, direct lending under the control of TCA Management.

19.     The purported qualifications and business practices of TCA Management are discussed in the SEC-filed brochure dated December 14, 2018. *See* Exhibit 2.

20.     TCA Management is ***not*** the general partner of any of the funds but acts as the investment manager of the Funds.  According to the Brochure, TCA Global Credit Fund GP,

Ltd., is the Fund's general partner. *Id.* at p. 5.

21.     In one Offering Memorandum dated January 2018, the structure of the fund is represented as follows:



Exhibit 1, p. 2.

22.     TCA Management and the individual Defendants are responsible for representations made in connection with the business and performance of the Master Fund and the Feeder Funds, including the Offering Memorandum and financial statements issued annually, among other things.

23.     The common element between all of the TCA entities and the substance of the

combined entities is that Press controls all of the entities as the majority shareholder, founder, principal, director, and/or owner.  At all material times, Press controlled every aspect of the business, with input and assistance from the other named individual Defendants.

24.     The Master Fund, according to the brochure, is primarily engaged in making high interest loans to small- and micro-cap companies.

25.     In the November 28, 2019 TCA Master Fund newsletter, TCA relayed positive numbers and 35 months of straight profits touting over $500 million in assets under management and a 7.07% year to date return.  *See* Exhibit 3.

26.     However, in early 2020, TCA insiders blew the whistle to the SEC alleging the numbers were fabricated and TCA had losses of over $200 million.

27.     TCA subsequently informed investors that it intended to liquidate the funds and would provide a detailed action plan within 30 days.

28.     No action plan has been released and TCA has gone dark.

## FACTUAL ALLEGATIONS

**I.     Plaintiffs' Investment**

29.     Plaintiff Todd Benjamin International, Ltd., is a UK entity.

30.     Beginning in or about June 2018, Todd Benjamin International invested through the foreign feeder fund into the Master Fund, and became a beneficial owner thereof.

31.     Plaintiff Todd Benjamin is acting for the benefit of his IRA Account.

32.     Beginning in or about June 2019, Plaintiff Benjamin invested his IRA funds through the domestic fund into the Master Fund and became a beneficial owner thereof.

33.     At the time of making his investment, Plaintiff Benjamin relied on the truthfulness and accuracy of the Fund's offering document, TCA Management's Form ADV,

marketing brochures, newsletters, and additional materials provided by TCA Management.

34.     Those documents included a purported historical financial performance of the Master Fund and NAV values for the Fund which were created for the benefit of investors. Those representations were false because, at all material times, the NAV was artificially inflated due to Defendants' failure to write-off bad loans, and to include phantom "investment advisory" fees that were based on fraudulent loan documents and were completely uncollectable, among other reasons.  Those financial documents are currently unavailable to Plaintiffs but will be obtained through discovery.

35.     Plaintiffs relied on the accuracy of the information made available to them by TCA Management in deciding to take a beneficial ownership interest in the Master Fund, and, thereafter, in deciding not to withdraw that investment.

36.     TCA Management and the individual officers and directors that are named Defendants were all aware that the financial statements regarding the NAV and historical returns in the offering documents were false, and that investors, including Plaintiffs, would rely on those statements.

37.     Defendants were collectively responsible for promulgating those false statements in furtherance of inducing Plaintiffs and other investors' investments, as beneficial owners, in the Master Fund.

## II.     The Whistleblowers

38.     In January 2020, NBC news broke the news that three TCA employees collectively filed an SEC whistleblower complaint accusing TCA of inflating both its earnings and assets for years.

39.     According to the whistleblowers, TCA failed to book losses on defaulted loans

and recorded fee revenues that it had not received in the form of phantom "advisory fees" that were never earned.

40.     Per the whistleblowers, TCA had inflated the hedge fund numbers since 2017, if not earlier, and TCA has at most $300 million in assets, not the $500 million reported to investors.  In all likelihood, it has significantly less than $300 million in assets, and investors will be returned pennies on the dollar, if anything.

### III.     TCA's Questionable Financials

41.     The TCA insider allegations are bolstered by Grant Thornton's audited financial statement for the year ending December 31, 2018, which only gave the Master Fund a qualified opinion by its auditors because it was unable to verify four distinct categories.  *See* Exhibit 4. The distinct categories include income, loan evaluation, the value of TCA Special Purpose Vehicles, and a receivable note worth $28 million from a related party.  Specifically, that audit provides:

   a.   TCA's Income:

   We were unable to verify the revenue recognized by the Master Fund in relation to investment banking income has met the revenue recognition criteria of IFRS 15. In relation to the year-end receivable balance amounting to US$72,910,116 we were unable to independently confirm the existence of US$37,853,277 with the relevant counterparty. As a result, we are unable to determine if investment banking income was earned in accordance with IFRS 15 during the year amounting to US$61,619,349 and the recoverability of the related receivable of US$72,910,116.

   b.   TCA's Special Purpose Vehicles

   As described in Note 2 and Note 4 to the financial statements, the Master Fund has carried its investments in Special Purpose Vehicles at fair value amounting to US$161,125,618 as at December 31, 2018. The valuation of the Special Purpose Vehicles was prepared by the Master Fund's Management with the assistance of independent third-party valuation firms. The valuations have been prepared based on assumptions regarding

future earnings and profitability of the underlying companies owned by the Special Purpose Vehicles. These projections are based on significant estimates made by management of the Special Purpose Vehicles and the Master Fund, the projections are used by independent third-party valuation firms as described in Note 4 in these financial statements as a significant input to estimate fair value. We have not been able to corroborate certain valuation inputs relating to forecasted earnings and profitability used in the valuations. This includes a subsequent-events review of forecasted versus actual results of the underlying companies for the period post year end. As a result, we were unable to determine the fair value of Special Purpose Vehicles as at December 31, 2018 fair valued at US$161,125,618.

c.  TCA Loans

We note that IFRS 9 was not applied for the full financial year and therefore we are unable determine the impact on net income as presented in the statement of comprehensive income and statement of changes in partners' capital had the IFRS 9 valuation model been applied for the full year.

The Master Fund has applied IFRS 9 in relation to the valuation of its Loans amounting to US$115,185,926 and related interest receivable amounting to US$7,179,521 as at December 31, 2018. Based on our review of the model applied by management to value the Loans and related interest in accordance with IFRS 9 we note that:

> • the model applies a uniform percentage for probability of default and loss given default which does not consider individual experience with each Loan and does not consider historic impairments;
> • the model does not include scenario analysis/range of possible outcomes to determine a weighted expected credit loss and instead uses managements best estimate, and
> • Managements best estimate often assumes takeover of the borrowing entity or a high success rate through litigation and does not allow for outcomes which may differ to this estimate.

As a result, we are unable to determine the completeness of the net expected credit loss of US$10,405,436 applied by management is in accordance with IFRS 9 and the potential impact on the carrying value of Loans amounting to US$115,185,926 and related interest receivable amounting to US$7,179,521. We were also unable to independently confirm the existence of US$8,658,952 of the above Loans with the relevant borrowers.

d.  Notes Receivable

> The Master Fund as described in Note 6 to the financial statements has a promissory note receivable from a related party amounting to US$28,304,047. The recoverability of this note is dependent on the continued operations of the Master Fund to generate sufficient management and performance fees to repay the promissory note. As at December 31, 2018 we were unable to verify if the related party had sufficient assets to repay the promissory note amounting to US$28,304,047.

Exhibit 4.

42.    Collectively, Grant Thornton was unable to opine on a large percentage of the Fund's assets, loans and receivables, and relies heavily on information directly from TCA's management. *Id.*

43.    TCA improperly failed to value its assets by inflating assets, failing to reduce valuations on companies it claimed were in default (and already in litigation), improperly accounting for assets transferred into the name of other TCA activities or insiders, and booking "advisory fees" as assets that were never earned, among other things.

44.    TCA Management attempted to explain-away the problems with the audit in a letter dated July 26, 2019, which coincided with the late release of the 2018 financials.  TCA blamed the auditor for the findings, claiming that "major accounting firms received some very public criticism coming into the 2018 audit season." In other words, TCA Management blamed the result on overly conservative auditors and minor issues that could be addressed at a later date. *See* Exhibit 5.

### IV.    **TCA's Massive Undisclosed Litigation History and Investment Defaults**

45.    According to TCA's offering memorandum, TCA states:

> From time to time, the Master Fund initiates civil commercial litigation matters as a creditor to enforce its obligations under various transaction agreements against debtors who have defaulted on their obligations to repay the Master Fund. On occasion, the Master Fund, the Investment Manager, the General Partner and/or their officers or principals are named

as defendants in a pre-emptive lawsuit and/or counterclaim filed by a defaulted debtor after the borrower is served with a notice of default. The defendants in such cases aggressively seek to dismiss preemptively filed cases by defaulted debtors.

Exhibit 1, p. 27.

46.     However, this disclosure fails to reveal TCA Management's true business model, which is to drive its investment targets into a financial death spiral — through overleveraging the company with debt — and then have the Master Fund sue its borrowers to foreclose on their assets rather than collect on the loans.

47.     Between 2014 and January 1, 2020, the Master Fund has been a party in over 100 cases in Broward County, Florida relating to TCA portfolio companies, as well as dozens of lawsuits in other jurisdictions, including in the Southern District of Florida, California, and Nevada.   On information and belief, the Master Fund has brought such lawsuits against the majority of its borrowers.

### V.     Investors Would Not Have Invested if TCA's Owner, Directors, and Others Disclosed their Real Backgrounds in TCA's Form ADV or the Offering Memorandum

#### A.  Robert Press

48.     Press promotes himself as one of the previous heads of global derivative products trading for the capital markets group of Chemical Bank.

49.     In reality, Press was associated with several financial services companies before forming TCA Management and the Master Fund.   Several of Press's companies, including the following, ultimately collapsed under allegations that Press was operating a boiler room or other financial fraud:

50.     Finantra Capital, Inc.

   a.   Press was CEO and Chairman of the Board of Finantra.

b.  Press was the subject of multiple lawsuits alleging he had failed to disclose a scheme to inflate Finantra's stock.

c.  An investor complaint alleging that Finantra and Press failed to disclose their scheme to inflate Finantra's stock price, and that Press personally solicited a purchase of nearly ten percent of Finantra's outstanding stock at a discount to the market price, led to a jury finding against Finantra and Press for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5.

51.  PCM Securities Limited, LP

a.  Press was a named respondent in *John Terwilliger v. PCM Securities Limited, LP a/k/a Royal Palm Investments, Ltd., Robert D. Press, et al.*, NASD Arb. No. 97-04990 (filed Oct. 15, 1997).  The claimants alleged violations of Alaska, Florida, New York, and United States law with respect to various securities transactions in their account, as well as breach of contract, breach of fiduciary duty, misrepresentation, negligent misrepresentation, professional negligence, willful and bad faith conversion of property, common law fraud, RICO, and punitive damages.  The specific allegations included:

•  PCM was engaged in "a complex scheme to defraud investors utilizing fraudulent sales practices and market manipulation in a boiler room environment."

•  "Robert Press was a control person at PCM Securities as well as a registered representative and agreed to exercise supervisory control and authority over the brokers at PCM/Royal Palm.  In or about 1996, Robert Press sold his interest in PCM/Royal Palm to Robert Mitchell and simultaneously agreed to manage the firm as Robert Mitchell did not have the required licenses.  In 1997 during the time that the [claimants] maintained their account at PCM/Royal Palm Robert Press acting together with Respondent Edelson had

13

full control and supervisory responsibility over all PCM/Royal Palm sales representatives including [the representative at issue in this arbitration]."

    b.   Press was found jointly and severally liable for compensatory damages ($649,141.00), attorneys' fees and costs ($76,914.00), and was personally the subject of a $15,000.00 discovery sanction.

    c.   Royal Palm's broker-dealer license was revoked in nearly every U.S. state, citing conduct including:

- Dishonest or fraudulent practices, including selling unregistered securities;

- Transacting business while its license was suspended; and

- Allowing its Fort Lauderdale office to conduct securities business prior to properly registering with the Florida Department of Banking and Finance.

52.    Additionally, Press's first attempt at launching the original TCA Fund, Trafalgar Capital Advisors, was forced to liquidate. Although TCA's offering memorandum characterizes it as a prior unrelated investment pool, the liquidator alleged TCA Management executed a series of investment transactions on behalf of the Fund that were specifically intended to artificially inflate the fund's NAV and convert fund assets for itself, among other things.

53.    No reasonable investor would have invested in the Master Fund or with its principal, Robert Press, if Defendants had disclosed Press's (and its other principals') backgrounds, TCA's litigation history, or the Master Fund's true financial condition.

**B.  Other Individual Defendants**

54.    Alyce Schreiber has been working with Press since Finantra, and is the named CEO of TCA Management with operating control over the company with the other individual Defendants. In the SEC-filed ADV form, Schreiber is listed as a control person of TCA Management.

55.    At all material times, William Fickling has been TCA Management's Chief Operating Officer, and on information and belief, founded TCA Management with Press and

maintains co-operating authority over TCA Management with the other individual Defendants. In the SEC-filed ADV form, Fickling is listed as a control person of TCA Management.

56.    At all material times, Thomas Day has been TCA Management's Chief Credit Officer, and on information and belief, maintains co-operating authority over TCA Management with the other individual Defendants.  In the SEC-filed ADV form, Day is listed as a control person of TCA Management.

57.    At all material times, Donna Silverman has been TCA Management's Chief Portfolio Strategist, and on information and belief, maintains co-operating authority over TCA Management with the other individual Defendants.  Donna Silverman is listed on the SEC-filed ADV form as an advisory affiliate to TCA Management.

58.    At all material times, Patrick Primavera has been the New York-based Managing Director of TCA Management, and on information and belief, maintains co-operating authority over TCA Management with the other individual Defendants.  In the SEC-filed ADV form, Primavera is listed as a control person of TCA Management.

59.    At all material times, Tara Antal has been TCA Management's Chief Compliance Officer.  Antal joined TCA after earning her MBA from the University of Central Florida in 2012, and has spent her entire career with the company. Upon information and belief, Antal maintains co-operating authority over TCA Management with the other individual Defendants. In the SEC-filed ADV form, Antal is listed as a control person of TCA Management.

**VI.    Liquidation**

60.    On or about January 21, 2020, shortly after news broke about the TCA whistleblowers, the Fund sent notice to investors that the Master Fund was shutting down.  *See* Exhibit 6.

61.     TCA Management cited the SEC investigation as one reason for the shut-down.

62.     The Fund told investors it would take 12 to 18 months to liquidate all positions of the Master Fund.

63.     The Master Fund promised that a detailed strategy plan would be sent to all investors within thirty (30) days.

64.     More than ninety days have passed since TCA Management made this announcement.  However, no "detailed strategy plan" has been sent to investors, and TCA Management and the Master Fund have gone dark, and have even shut down their website.  The former website, tcaglobalfund.com, now shows the following:



**VII.     Defendants Made Numerous Materially False and Misleading Statements and Omissions to Plaintiffs and Other Class Members**

65.     Throughout the Class Period, TCA Management and the other Defendants issued offering materials and financial statements to Plaintiffs and Class members that contained materially false information, including but not limited to the following:

        a.   Defendants inflated the NAV and historical returns by refusing to write-off bad

16

loans and by creating phantom investment advisory fees that were never earned, were uncollectable, and were based on fraudulent loan documentation;

b.   Defendants misrepresented the objective of the Master Fund's business, which was not to make high interest loans that were to be repaid, but to make such loans to use in litigation to collect the assets of the subject borrowers through hundreds of lawsuits filed around the country;

c.   Defendants omitted the tainted background of Press and other control persons in the offering documents and ongoing SEC-disclosures;

d.   Press, on information and belief, engaged in undisclosed conversion of assets belonging to the Master Fund and failed to disclose such breaches of his fiduciary duty.

66.    The above misrepresentations and omissions were material to Plaintiffs and the other investors' evaluation of the Fund, and their decision to invest in, and continue to maintain their respective investments, in the Fund.

67.    Defendants knew that prospective and current investors, including Plaintiffs, would rely to their detriment upon the above misrepresentations and omissions, and, indeed, intended for such investors and Plaintiffs to rely on those misrepresentations and omissions in order to take a beneficial interest in the Master Fund and continue to hold that investment.

68.    Plaintiffs and the other investors were reasonable in relying upon the misrepresentations and omissions in the offering materials and financial statements.

## **CLASS ACTION ALLEGATIONS**

69.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and/or (b)(3) on behalf of themselves and a nationwide class consisting of:

All investors who purchased or otherwise held a beneficial interest in one or more of the TCA funds on January 21, 2020 (the "Class").

70.     The Class Period begins when the earliest Class member made its investment in one or more of the TCA funds and continued to hold a beneficial interest in the Master Fund through January 21, 2020.

71.     The Class excludes Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, legal representatives, successors, and assigns, and Defendants' immediate family members.

72.     **Numerosity**.  Based on TCA Management's SEC disclosures, the Fund had approximately four hundred beneficial owners at the time it discontinued redemptions and began dissolution.

73.     **Typicality**.  Plaintiffs' claims are typical of the claims of the Class insofar as Plaintiffs similarly owned a beneficial interest in the Master Fund at the time redemptions ceased and dissolution began, and were therefore harmed by the same wrongful activity as other Class members.

74.     **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the Class and do not have any claims that are antagonistic to those of the Class. Plaintiffs have retained counsel experienced in complex nationwide class actions, including securities litigation. Plaintiffs' counsel will fairly, adequately, and vigorously protect the interests of the Class.

75.     **Commonality and Predominance**.   Common questions of law and fact predominate over any questions affecting individual Class members, including, but not limited to, the following:

a.  Whether the offering materials and financial statements contained material misrepresentations and/or omissions of material fact that induced Class members' initial and continued investment in the Fund until the dissolution was announced and redemptions were suspended;

    b.  Whether TCA Management, Press, and the other Defendants breached their obligations under the Investment Adviser Act of 1940 and fiduciary duties to Plaintiffs and the Class by artificially inflating the NAV and reported returns of the Master Fund, and by diverting funds from the Master Fund; and

    c.  Whether Plaintiffs and Class members were damaged as a result of Defendants' conduct.

76.    **Superiority.**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The burden and expense of managing many actions arising from Defendants' fraud, and the potential for inconsistent results, counsel in favor of a class action — which presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## EQUITABLE TOLLING AND DISCOVERY OF THE WRONGDOING

77.    As a result of Defendants' conduct, Plaintiffs and Class members were not aware of Defendants' misconduct and were prevented from learning the facts necessary to commence an action against Defendants for the wrongful conduct alleged in this complaint until the whistleblower complaint was disclosed and TCA Management sent the liquidation notice. The facts necessary for Plaintiffs to formulate the basis of a complaint and satisfy applicable pleading standards were within the exclusive control of Defendants, as well as the individuals and entities that aided and abetted Defendants.  Rather than disclosing that information to Plaintiffs and the Class, Defendants opted to conceal it, including by promulgating the offering memorandum, annual financial statements, and other statements about the Master Fund and Feeder Funds' business and performance without including appropriate disclosures.

78.    Plaintiffs and the members of the Class have acted diligently in seeking to bring their claims promptly. Because of Defendants' active steps — including, but not limited to, concealing the material information detailed above — Plaintiffs assert the applicable statute of

limitations for Plaintiffs and the Class's claims were tolled, and Defendants are equitably estopped from asserting any statute of limitations defense.

79.     Defendants are equitably estopped from asserting that any otherwise applicable period of limitations has run.

80.     In addition, as a result of Defendants' breaches of fiduciary duties and other wrongdoing, and concealment of the same (as described herein), Plaintiffs and Class members were prevented from discovering their claims against Defendants until recently.

81.     Accordingly, the discovery rule also applies to toll the statute of limitations in this case.

82.     With regard to the derivative claims set forth herein, any demand by Plaintiffs that TCA Management authorize a lawsuit by the Master Fund against itself would be futile because of Defendants' complete domination and control of the Master Fund.

**CAUSES OF ACTION**

**COUNT I**
**Rescission Under the Investment Advisers Act of 1940**
**(Against All Defendants on behalf of the Master Fund and Feeder Funds)**

83.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 82 as if set forth in full herein.

84.     This is a derivative action on behalf of the Master Fund and Feeder Funds.

85.     As set forth above, any demand for the Master Fund or Feeder Funds to bring this claim would be futile.

86.     This is an action for rescission and to recover restitution under the Investment Advisers Act of 1940 ("IAA"), specifically, Section 215(b).

87.     Under Section 214 of the IAA, this Court has jurisdiction, and venue belongs in the Southern District of Florida because Defendants transacted their business in Miami-Dade County, Florida.

88.     Defendants, including TCA Management and the individual Defendants, are the investment advisor, and officers and directors, to the Master Fund and Feeder Funds.

89.     Defendants used the mails and interstate commerce to defraud Plaintiffs and Class members by, among other things, fraudulently misrepresenting material facts and fraudulently concealing and failing to state material facts with the intent to deceive or defraud Plaintiffs, all as set forth herein.

90.     Further, on information and belief, Defendants acted for their own respective accounts by cashing out their investments in the Master Fund at inflated NAVs prior to the initiation of the dissolution.

91.     By violating the IAA, the Master Fund and Feeder Funds are entitled to rescission of the their agreements with TCA Management and/or the other Defendants, and the return of all fees paid to Defendants by the Master Fund and Feeder Funds.

92.     The Master Fund and Feeder Funds have been damaged by Defendants' actions in an amount to be proven at trial, but which is believed to be in excess of $5,000,000. In addition, and in the alternative, Plaintiffs, acting on behalf of the Master Fund and Feeder Funds, are entitled to an order that Defendants be required to disgorge all fees, and recession of the agreement between TCA Management and the Master Fund and Feeder Funds.

## COUNT II
### Breach of Fiduciary Duty
### (Against All Defendants on behalf of the Master Fund and Feeder Funds)

93.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 82 as if set forth in full herein.

94.     This is a derivative action on behalf of the Master Fund and Feeder Funds.

95.     Defendants were the investment advisor, and officers and directors, to the Master Fund and Feeder Funds, and accordingly, owed a fiduciary duty to those funds.

96.     Defendants defrauded the Master Fund and Feeder Funds by, among other things, fraudulently misrepresenting material facts and fraudulently concealing and failing to state material facts with the intent to deceive or defraud those funds, all as set forth herein.  Further, on information and belief, Defendants acted for their own respective accounts by cashing out their investments in the Master Fund at inflated NAVs prior to the initiation of the dissolution.

97.     In addition, Defendants mismanaged the Master Fund and Feeder Funds by overleveraging borrowers in order to take their assets and artificially inflating the NAV of the Funds to the detriment of the Master Fund, Feeder Funds, and the borrowers.

98.     By virtue of their domination and control, Defendants reaped enormous profits from their management of the Master Fund and Feeder Funds.

99.     The Master Fund and Feeder Funds have been damaged by the Defendants' actions in an amount to be proven at trial.  That amount is believed to be in excess of $5,000,000.

100.     Defendants' actions were willful, malicious, and taken in willful and wanton disregard of the Master Fund and Feeder Funds' rights.  Alternatively, Defendants' actions were so reckless or wanting in care that they constitute a conscious disregard or indifference to the

rights of the Master Fund and Feeder Funds. Thus, the Funds are entitled to an award of punitive damages.

## COUNT III
### Negligent Misrepresentation
### (Directly Against All Defendants)

101. Plaintiffs reallege and incorporate by reference paragraphs 1 through 81 as if set forth in full herein.

102. This is a direct action against Defendants for negligent misrepresentation.

103. Defendants misrepresented material facts and concealed and/or failed to state material facts.  Specifically, among other things, Defendants prepared and authorized financial statements, offering documents, and newsletters, that artificially inflated the NAV of the Master Fund, which resulted in significant unearned fees being paid to Defendants and massive losses to the Master Fund through inflated redemptions of investors that redeemed before January 21, 2020, among other things.

104. Defendants should have known that those statements and material omissions were false and misleading when made.

105. Defendants made the false representations and omitted material facts intending to induce Plaintiffs and Class members to rely on the representations and invest in beneficial ownership interests in the Master Fund.

106. Plaintiffs and Class members justifiably relied on Defendants' false representations and non-disclosures in investing and taking a beneficial ownership interest in the Master Fund and, as a result, were injured insofar as their interests have declined in value materially.

107.    Defendants' actions were so reckless or wanting in care that they constitute a conscious disregard or indifference to the rights of the Plaintiffs and Class members. Thus, Plaintiffs and Class members are entitled to an award of punitive damages.

**COUNT IV**
**Breach of Fiduciary Duty**
**(Directly Against All Defendants)**

108.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 81 as if set forth in full herein.

109.    This is an action against Defendants for breach of fiduciary duty.

110.    TCA Management was a registered investment advisor under the IAA and the individual Defendants were controlling directors and managers of TCA Management.

111.    TCA Management and its controlling directors and managers owed a fiduciary duty to the Master Fund, Feeder Funds, and their beneficial owners, including Plaintiffs and Class members. Specifically, Defendants offered investment advice and managed the pooled investment of the Master Fund for the beneficial owners thereof.

112.    As such, TCA Management and the individual Defendants owed fiduciary duties to all beneficial owners of the Master Fund.

113.    As described herein, Defendants breached their fiduciary duties by (1) causing and failing to inform the beneficial owners of the Master Fund that the NAV was artificially inflated with phantom advisory fees and bad loans, (2) failing to disclose that the true business model was to make high interest loans in order to seize borrowers' assets, (3) and by failing to disclose the material information about Press's background, among other things set forth herein.

114.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class members were damaged.

115.    Defendants' actions were intentional or so reckless or wanting in care that they constitute a conscious disregard or indifference to the rights of the Plaintiffs and Class members. Thus, Plaintiffs and Class members are entitled to an award of punitive damages.

116.    Accordingly, Plaintiffs and Class members are entitled to damages in an amount to be proven at trial.

**Count V**
**Unjust Enrichment**
**(Directly Against All Defendants)**

117.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 81 as if set forth in full herein.

118.    Plaintiffs and Class members have conferred a benefit upon Defendants by investing as beneficial owners of the Master Fund, which was used by Defendants to generate their own inflated fees and to redeem other investors' interests at inflated values, among other things.

119.    Defendants voluntarily accepted and retained the benefits conferred upon them by Plaintiffs and Class members.

120.    The circumstances are such that it would be inequitable for the Defendants to retain the benefit without paying the value thereof to Plaintiffs and Class members.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs' counsel as Class counsel;

B.     Awarding compensatory damages to Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be determined at trial;

C.     Awarding punitive damages to Plaintiffs and the Class against Defendants for the legal Counts;

D.     Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the extent permitted by law;

E.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

F.     Granting Plaintiffs and the Class appropriate equitable relief; and

G.     Granting such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted this 30th day of April, 2020.

**WEINBERG WHEELER HUDGINS**      **SILVER LAW GROUP**
**GUNN & DIAL, LLC**

*/s/Aaron M. Cohn*                        */s/ Scott L. Silver*
Aaron M. Cohn, Esq.                  Scott L. Silver
Florida Bar No.: 95552              Fla. Bar No. 095631
Weinberg Wheeler Hudgins       11780 W. Sample Road
Gunn & Dial, LLC                 Coral Springs, Florida 33065
2601 South Bayshore Drive       T: (954) 755-4799
Suite 1500                      F: (954) 755-4684
Miami, FL 33133               E-mail: ssilver@silverlaw.com
T: (305) 455-9500             rfeinberg@silverlaw.com
F: (305) 455-9501             *Counsel for Plaintiff*
E-mail: acohn@wwhgd.com
dmallqui@wwhgd.com
mferrer@wwhgd.com
*Counsel for Plaintiff*

**GIBBS LAW GROUP LLP**

*/s/ David Stein*
David Stein (*pro hac vice* to be submitted)
Kyla J. Gibboney (*pro hac vice* to be submitted)
505 14th Street, Suite 1110
Oakland, CA 94612
T: (510) 350-9700
F: (510) 350-9701
E-mail: ds@classlawgroup.com
kjg@classlawgroup.com
*Counsel for Plaintiff*

## VERIFICATION

I, *TODD BENJAMIN*, hereby state that: (1) I am a beneficial owner and/or member and/or partner with an interest in the Master Fund, as defined herein, at the time of the wrongdoings and transactions complained of herein; (2) this action is not a collusive one to confer jurisdiction that the court would otherwise lack; and (3) I have not made an effort to obtain the desired action from the directors or persons with authority over the Master Fund and Feeder Funds because those persons are the Defendants in this lawsuit, and any such request made to the Defendants to authorize a lawsuit against themselves would be futile.

Todd Benjamin