UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| TODD BENJAMIN INTERNATIONAL, LTD. and TODD BENJAMIN, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>GRANT THORNTON INTERNATIONAL LTD., GRANT THORTON CAYMAN ISLANDS, GRANT THORNTON IRELAND, BOLDER FUND SERVICES (USA), LLC, and BOLDER FUND SERVICES (CAYMAN), LTD.,<br><br>      Defendants. | Case No. 1:20-CV-21808<br><br>Amended Class Action Complaint<br><br>**Jury Trial Demanded** |

## AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Todd Benjamin International, Ltd. and Todd Benjamin ("Plaintiffs"), individually and behalf of all others similarly situated, sue Defendants Grant Thornton International Ltd. ("GTIL"), Grant Thornton Cayman Islands ("GT Cayman"), Grant Thornton Ireland ("GT Ireland," and together with GTIL and GT Cayman, "Grant Thornton"), Bolder Fund Services (USA), LLC ("Bolder USA"), and Bolder Fund Services (Cayman), Ltd. ("Bolder Cayman," and together with Bolder USA, "Circle Partners"), alleging as follows:

## INTRODUCTION

This is an action for negligent misrepresentation, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty against Grant Thornton and Circle Partners for enabling a massive overvaluation scheme orchestrated through a private investment fund structure managed by TCA Fund Management Group Corp. ("TCA Management") that resulted in hundreds of millions of dollars in losses to investors. TCA Global Credit Master Fund, L.P. ("Master Fund")

served as the primary fund for various TCA entities through a "master-feeder" fund structure. That structure, discussed in more detail below, uses other funds to funnel money to the Master Fund in order to aggregate all funds in one place. The Master Fund's supposed business was to make high-interest, collateralized loans to micro- and small-cap companies in need of short-term capital.

Certain directors and officers of TCA Management knowingly inflated the net asset value ("NAV") of the Master Fund by, among other things, failing to remove or properly value bad loans and by creating phantom "investment advisory" fees that were illusory and uncollectable. As a consequence of inflating the NAV with bad loans and phantom fees, TCA Management was paid excessive management fees for advising the Master Fund and Feeder Funds as the SEC-registered investment advisor and its officers and directors, and redeemed investments in the TCA funds at excessive values, before the fund collapsed and entered a dissolution process on or about January 21, 2020.

Central to TCA Management's mismanagement was Circle Partners' and Grant Thornton's knowledge of, active assistance in and downplaying of significant control issues and misleading accounting practices of TCA Management. Under the guise of an "independent" auditor, Grant Thornton coordinated with TCA Management to neuter and/or conceal the alarming nature of TCA Management's business practices, and the fact that much of TCA Management's NAV was inflated with uncollectable or nonexistent debt. As early as April 2018, Grant Thornton learned of and identified the lack of support for a sizeable part of TCA Management's supposed value, and learned of various accounting control deficiencies that posed a risk of material misstatement. And while Grant Thornton acknowledged these issues in drafts and internal correspondence, the material it published downplayed or outright omitted such information. This was no accident, as communications between certain TCA directors and officers and Grant Thornton show a calculated

effort to sanitize Grant Thornton's findings and support the TCA entities' continued business.

Likewise, as the purported "independent" fund administrator with responsibility for calculating the Funds' NAV on a monthly basis, Circle Partners failed to follow its own internal policies requiring independent verification of assets, and allowed certain members of TCA Management to change and re-write the monthly NAV on a regular basis.  Indeed, internal emails reveal a process through which Circle Partners would ask if TCA Management was "comfortable" with the monthly NAV, and, following that monthly check-in, would revise the NAV based on unsupported feedback from certain members of TCA Management.   As a result, TCA Management's NAV was inflated by tens of millions of dollars.   Circle Partners failed to perform its basic financial gatekeeping and deferred questionable accounting practices to TCA Management.[1]

Plaintiffs, being unaware of the wrongful practice of artificially inflating the NAV of the Master Fund, elected to invest in and/or to not redeem their respective investments in the Master Fund.  The Master Fund, which reported assets in excess of $500 million, is now allegedly missing at least $400 million.  The claims asserted in this lawsuit are based on Grant Thornton's and Circle Partners' reckless practices, negligence and/or their respective efforts to aid and abet the deception that caused millions of dollars in damages to Plaintiffs and investors. As a result, Plaintiffs assert claims against Grant Thornton and Circle Partners for negligent misrepresentation, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty.

---

[1]     The entities that provided the fund administration, Circle Investment Support Services (USA), LLC and Circle Investment Support Services (Cayman), Ltd., merged into Bolder Investment Support Services (USA), LLC and Bolder Investment Support Services (Cayman), Ltd., respectively, in or around October, 2021.  Those "Bolder" entities are referred to herein as "Circle Partners" because, during the relevant time-period, the services were provided by the "Circle" entities rather than the "Bolder" entities.

## THE PARTIES

1. Plaintiff Todd Benjamin International, Ltd., is a legal entity incorporated in the United Kingdom.

2. Plaintiff Todd Benjamin, acting for the benefit of his IRA account, is a resident of the United Kingdom and a citizen of the Unites States.

3. GTIL is an entity incorporated in England and Wales and is headquartered in London, England, United Kingdom. GTIL comprises its worldwide member firms that operate and provide services under the "Grant Thornton" brand. Relevant here, GT Cayman and GT Ireland are noted as "member firms representing [GTIL]" for the services to TCA Management. GTIL therefore acknowledges that GT Cayman and GT Ireland act for GTIL. In addition, GTIL's stated purpose includes monitoring and enforcing standards applicable to member firms and coordinating strategy and policies applicable to member firms. Consistent with this structure, the audit opinions at issue in this action (discussed below), are signed by "Grant Thornton" under "Grant Thornton" letterhead. Given this relationship, the shared branding, and control by GTIL over its member firms, GTIL is responsible as principal for the acts of GT Cayman and GT Ireland.

4. GT Cayman is a legal entity organized under the laws of the Cayman Islands. It is a member firm of GTIL and provides services under the "Grant Thornton" brand on behalf of GTIL.

5. GT Ireland is a legal entity organized under the laws of Ireland. It is a member firm of GTIL and provides services under the "Grant Thornton" brand on behalf of GTIL.

6. Bolder USA is a Delaware limited liability company with its principal place of business in Orlando, Florida. It was formerly known as Circle Investment Support Services (USA), LLC before changing its name in October 2021.

7.      Bolder Cayman is a legal entity organized under the laws of the Cayman Islands. It was formerly known as Circle Investment Support Services (Cayman), Ltd. before changing its name in October 2021.

## RELEVANT NON-PARTIES

8.      TCA Management is an SEC-registered investment advisor located in, and managed from, Aventura, Florida, and is incorporated under laws of the State of Florida.  TCA Management was at all material times the SEC-registered investment manager of the Master Fund and other Feeder Funds, discussed below.

9.      Robert Press is the Founder and Director of the Master Fund and of TCA Management, and a resident of the State of Florida.  According to SEC-filed form ADV for TCA Management, TCA Management is controlled and majority owned by Robert Press.

10.     Alyce Schreiber is the former Chief Executive Officer of TCA Management and a resident of the State of Florida.

11.     William ("Bill") Fickling is the former Chief Operating Officer of TCA Management.

12.     Thomas Day is the former Chief Credit Officer of TCA Management.

13.     Donna Silverman is the former chief portfolio manager of TCA Management.

14.     Patrick Primavera is the former managing director of TCA Management.

15.     Tara Antel is the Chief Compliance Officer of TCA Management and a resident of the State of Florida.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action and the amount in

controversy exceeds $5 million, exclusive of interest and costs, and Plaintiffs — as well as other class members — are citizens of different states than Defendants, who reside, in part, outside the United States.

17.     The Court has personal jurisdiction over GTIL, GT Cayman and GT Ireland (for purposes of this section, the "GT Entities") on the following grounds:

    a.  The GT Entities committed the tortious acts complained of herein within Florida.  Specifically, the GT Entities aided and abetted the acts and breaches of fiduciary duty alleged herein through in-person meetings with TCA Management attended by representatives of each of the GT Entities in Florida and New York on at least three different occasions; by calling TCA Management in Florida, through substantial email communications by representatives of each of the GT Entities directed to TCA Management in Florida;, and through sending final audit reports to TCA Management in Florida that contained misrepresentations and omissions that they knew would be used to induce Class Plaintiffs and class members to invest in the funds or continue their investments.  Moreover, GT Ireland and GT Cayman provided this assistance pursuant to engagement letters provided to and signed by Press purportedly on behalf of TCA Global Credit Fund, Ltd., TCA Global Credit Fund, LP, and TCA Global Credit Master Fund, LP and received payment from its services from TCA Management in Florida. As well, the GT Entities aligned with the Florida-based TCA Defendants ostensibly to provide auditing services in compliance with U.S. laws, regulations, auditing standards and for dissemination to investors and others located in Florida. The GT Entities

therefore committed the tortious conduct at issue in Florida or through communications into and with persons in Florida.

b. This Court also has jurisdiction over the GT Entities because their representatives traveled to Florida multiple times to meet with TCA Management's representatives, had substantial telephonic and email communications with TCA Management's representatives in Florida regarding the misleading audits, and prepared audit materials for publication by TCA Management in Florida to comply with U.S. laws and regulations, all pursuant to its relationship with TCA Management. As a result, the GT Entities purposely availed themselves of the privilege of conducting activities within Florida; Plaintiffs' claims arise out of and relate to those contacts; and personal jurisdiction over the GT Entities comports with traditional notions of fair play and substantial justice.

c. Finally, this court has personal jurisdiction over the GT Entities because their tortious conduct caused damage to class members, some of whom reside in Florida, and prolonged the Florida-based TCA Defendants' scheme.

18. The Court has personal jurisdiction over Circle Partners (Bolder Fund Services (USA), LLC and Bolder Fund Services (Cayman), Ltd.) on the following grounds:

a. Circle Partners committed its tortious acts here in Florida. Specifically, as the administrator for the Feeder Funds and Master Fund, as defined below, Circle Partners provided a variety of services, including investor relations, financial accounting, and monthly "Net Asset Value" calculations used to value each individual investor's investment at any given time. The financial

administrative work, including the monthly NAV calculations, were performed by Circle Partners out of their Orlando office — primarily by Chad Fairchild and Keith Schult.  In addition, on information, representatives of Circle Partners had several in-person meetings with TCA Management at Circle Partners' offices in Orlando, and at TCA Management's offices in Aventura, Florida.  Moreover, on information and belief, Circle Partners provided this assistance pursuant to administration agreements provided to and signed by Press, purportedly on behalf of TCA Global Credit Fund, Ltd., TCA Global Credit Fund, LP, and TCA Global Credit Master Fund, LP, and received payment from its services from TCA Management in Florida. As well, Circle Partners aligned itself with the Florida-based TCA Defendants ostensibly to provide administrative services in compliance with U.S. laws, regulations, auditing standards and for dissemination to investors and others located in Florida.  Indeed, among other things, Circle Partners provided "Know Your Customer" due diligence designed to comply with United States' banking laws. Circle Partners therefore committed the tortious conduct at issue in Florida or through communications into and with persons in Florida.

b. This Court also has jurisdiction because Circle Partners prepared audit materials in connection with Grant Thornton's audits for publication by TCA Management in Florida to comply with U.S. laws and regulations, all pursuant to its relationship with TCA Management.

c. In addition, this court has personal jurisdiction over Circle Partners because their tortious conduct caused damage to class members, some of whom reside

in Florida, and prolonged the Florida-based TCA Defendants' scheme.

    d. As a result of these activities, Circle Partners purposely availed of the privilege of conducting activities within Florida, Plaintiffs' claims arise out of and relate to those contacts, and personal jurisdiction over Circle Partners comports with traditional notions of fair play and substantial justice.

19. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of Florida because a substantial part of the events or omissions giving rise to the claims occurred in this District; specifically, in Aventura, Florida.

## **SUMMARY**

20. TCA Management is an SEC-registered investment advisor that is majority owned and controlled by Press.

21. TCA Management provides investment advisory services to three pooled investment vehicles, according to SEC-filed ADV forms. Specifically, those pooled investment vehicles are:

    a. TCA Global Credit Fund, LP, which directly invest substantially all of its assets in the Master Fund and serves as the vehicle for investment in the Master Fund by U.S. citizens;

    b. TCA Global Credit Fund, Ltd., which invests substantially all of its assets in the Master Fund through TCA Global Lending Corp., and serves as the vehicle for investments in the Master Fund by foreign citizens; and

    c. TCA Global Credit Master Fund, LP (i.e., the "Master Fund"), which is used to pool all assets invested by U.S.-based and foreign-based investors from the two feeder funds.

22. In summary, the first two funds, TCA Global Credit Fund, L.P. and TCA Global Credit Fund, Ltd. (collectively "Feeder Funds"), feed investments into the Master Fund, which is used for short term, senior secured, direct lending under the control of TCA Management.

23.     The purported qualifications and business practices of TCA Management are discussed in the SEC-filed brochure dated December 14, 2018.  *See* Exhibit 1.

24.     TCA Management is ***not*** the general partner of any of the funds but acts as the investment manager of the Funds.  According to the Brochure, TCA Global Credit Fund GP, Ltd., is the Fund's general partner.  *Id.* at p. 5.

25.     In one Offering Memorandum dated January 2018, the structure of the fund is represented as follows:



Exhibit 1, p. 2.

10

26.     TCA Management was responsible for representations made in connection with the business and performance of the Master Fund and the Feeder Funds, including the Offering Memorandum and financial statements issued annually, among other things.

27.     The Master Fund, according to the brochure, is primarily engaged in making high interest loans to small- and micro-cap companies.

28.     In the December 2019 TCA Master Fund newsletter, TCA relayed positive numbers and 35 months of straight profits touting over $500 million in assets under management and a 7.07% year to date return.  *See* Exhibit 2.

29.     However, in early 2020, TCA insiders blew the whistle to the SEC alleging the numbers were fabricated and TCA had losses of over $400 million.

## FACTUAL ALLEGATIONS

### I.     Plaintiffs' Investment

30.     Plaintiff Todd Benjamin International, Ltd., is a UK entity.

31.     Beginning in or about June 2018, Plaintiff Todd Benjamin International invested through a feeder fund into the Master Fund and became a beneficial owner thereof.

32.     Plaintiff Todd Benjamin is acting for the benefit of his IRA Account.

33.     Beginning in or about June 2019, Plaintiff Benjamin invested his IRA funds through a feeder fund into the Master Fund and became a beneficial owner thereof.

34.     At the time of making his investment, Plaintiff Benjamin relied on the truthfulness and accuracy of the Fund's offering document, TCA Management's Form ADV, marketing brochures, newsletters, audited financial statements by Grant Thornton, NAV calculations calculated and approved by Circle Partners, and additional materials provided by TCA Management.

35.     Those documents included a purported historical financial performance of the Master Fund and NAV values for the Fund which were created for the benefit of investors.  Those representations were false because, at all material times, the NAV was artificially inflated due to certain TCA directors' and/or officers' failure to write-off bad loans, and to include phantom "investment advisory" fees that were based on fraudulent loan documents and were completely uncollectable, among other reasons.

36.     Plaintiffs relied on the accuracy of the information made available to them by TCA Management, Circle Partners, and Grant Thornton in deciding to take a beneficial ownership interest in the Master Fund, and, thereafter, in deciding not to withdraw that investment.

37.     TCA Management, Grant Thornton, Circle Partners, and certain of the individual officers and directors were all aware that the financial statements regarding the NAV, assets of the Funds, and historical returns in the offering documents were misleading, and that investors, including Plaintiffs, would rely on those statements.

## II.     **The Whistleblowers**

38.     In January 2020, NBC news broke the news that three TCA employees collectively filed an SEC whistleblower complaint accusing TCA of inflating both its earnings and assets for years.

39.     According to the whistleblowers, TCA failed to book losses on defaulted loans and recorded fee revenues that it had not received in the form of phantom "advisory fees" that were never earned.

40.     Per the whistleblowers, TCA had inflated the hedge fund numbers since 2017, if not earlier, and TCA had at most $300 million in assets, not the $500 million reported to investors. In all likelihood, it has significantly less than $300 million in assets, and investors will be returned

pennies on the dollar, if anything.

### III.     TCA's Questionable Financial Accounting Practices

### A.     Grant Thornton

41.     Pursuant to its engagement letters with the Master Fund and Feeder Funds, Grant Thornton was to serve as independent auditor to evaluate TCA Management's statements of financial positions for the years ending 2017 and 2018.  In assessing the potential for material misstatements by TCA , Grant Thornton also undertook the duty to evaluate TCA Management's accounting policies and the reasonableness of management's accounting estimates.

42.     GT Ireland and GT Cayman executed the engagement letters, and thereafter provided the auditing services as members and representatives of GTIL using the "Grant Thornton" brand.  Specifically, the engagement letters describe GT Cayman and GT Ireland as "member firms representing [GTIL]" for the audit services.

43.      GTIL approved and/or ratified this relationship through its relationship with member firms such as GT Ireland and GT Cayman.  GTIL monitors and enforces the professional standards applicable to its member firms and coordinates strategy and policies for these firms. GTIL thus exercises control over GT Ireland and GT Cayman in their management, marketing, and provision of services under the "Grant Thornton" name.

44.     Pursuant to this arrangement between GTIL, GT Ireland, and GT Cayman, the audit reports generated by GT Ireland and GT Cayman were signed on behalf of "Grant Thornton" using "Grant Thornton" letterhead. GTIL is therefore responsible for the acts and omissions of GT Ireland and GT Cayman, as alleged herein, because it created an actual agency and/or apparent authority relationship with GT Ireland and GT Cayman.

45.     After replacing TCA Management's prior auditor in late 2017, Grant Thornton

quickly noticed that TCA Management lacked support for the purported "advisory fees," "investment banking fees," and tens of millions of dollars in indebtedness payable from TCA Management, as investment manager.

46.     Grant Thornton investigated how TCA Management was accounting for the funds' assets and confirmed its understanding with various inquiries and a review of TCA Management's financial and business records.

47.     As a result of its preliminary investigation, Grant Thornton expressed to certain TCA Management its concerns about, among other things, the timing of income recognition, values not being recorded in accordance with the International Financial Reporting Standards ("IFRS"), a lack of evidence to support collectability, and uncertainties surrounding litigation outcomes.

48.     Grant Thornton's draft audit findings report for 2017 highlighted notable control deficiencies by TCA Management, including: (i) improper revenue recognition, (ii) management override of controls, (iii) lack of appropriate documentation for amounts receivable related to investment banking work as derivative assets and warrants, (iv) lack of audit evidence for loans and improper classification of loan performance and valuation of loans, (v) lack of definite documentation as to repayment of note receivable by TCA Management, (vi) improper and unclear valuation for special purpose vehicles ("SPVs") owned by the Master Funds, and (vii) other control observations, such as inadequate records maintenance and loan management systems.

49.     Thus, by early 2018, Grant Thornton had actual knowledge of improper conduct in the recognition and reporting of the Master Fund and Feeder Funds' assets, and that those calculations were based on unverifiable figures and pervasive mismanagement by TCA Management.

50.     TCA Management, having been advised of Grant Thornton's concerns, requested that Grant Thornton tailor its audit to TCA's purported business practices to justify (at least in part) the Master Fund and Feeder Funds' stated financials.  Despite its knowledge of the improper conduct, Grant Thornton agreed.

51.     The result was Grant Thornton's final qualified audit report for 2017 being published with the Master Fund's financial statements, which either downplayed these significant control issues or outright omitted them.

52.     Moreover, Grant Thornton's internal audit report for 2017, which theoretically should have supported its April 30, 2018 opinion contained in TCA Management's financial statements for 2017, was not complete until mid-July 2018.  Grant Thornton thus opined on TCA Management's financial condition even before it had completed its full review of material issues that would affect that financial condition.

53.     Moreover, Grant Thornton's final audit report for 2017 hid from the public the serious control issues that eventually led to the failure of TCA Management's business and intervention by the SEC.  For example, the draft report describes a systemic deficiency in the revenue recognition policy, while the final report suggests the issue is limited to investment banking income recognition.  And, while the draft report references no documented means or timeframe for the repayment of a note receivable from TCA Management, the final audit claims that recovery is dependent on the continued operations of the Master Fund.  In addition, the draft report identified various instances of inadequate procedures to comply with basic accounting standards, but the final report does not disclose or account for these deficiencies. The brevity with which the final report mentions these issues resulted in the omission and mischaracterization of the scope and severity of various deficiencies.

54.     Because Grant Thornton agreed to be "flexible" when finalizing the 2017 audit report, TCA Management agreed to continue its relationship with Grant Thornton for the 2018 financial statements.

55.     Given the significant issues that Grant Thornton uncovered, TCA Management and Grant Thornton began planning the 2018 audit around TCA Management's control and accounting deficiencies.

56.     For at least one meeting between TCA's directors and officers and Grant Thornton at TCA's Florida office, the agenda provided for "changes to [audit] approach," thereby demonstrating Grant Thornton's willingness to bend the analysis favorably toward TCA Management's business model, and sought to address the various issues from the 2017 audit.

57.     Throughout this process, Grant Thornton contacted various borrowers of the Master Fund to confirm the supposed investment advisory fees or investment banking fees payable to TCA Management (which, in turn, inflated their NAV).  Grant Thornton received numerous responses disputing the alleged fees and noting that no services were provided or approved. Some responses to Grant Thornton were more colorful, claiming that TCA Management was engaged in a fraud and threatening referrals to government agencies.  According to one insider, at least 90% of the investment banking fees could not be confirmed by Grant Thornton.

58.     Grant Thornton therefore knew that the debt included by the Master Fund on its books did not exist as represented to investors, or that it could not verify its validity.  These amounts were significant, totaling more than $70 million in purported income in 2017 alone.

59.     Despite Grant Thornton's accommodations to TCA Management, in April 2019 Grant Thornton indicated that a qualified opinion was not an option for the 2018 financials because of the various qualifications and materiality of those issues.  Grant Thornton expressed its intent

to either issue an "adverse" opinion to TCA Management because the financial statements did not fairly represent the Master Fund and Feeder Funds' condition, or to issue a disclaimer stating that it had been unable to provide a basis for an audit opinion for lack of appropriate audit evidence.

60.     Notably, the reasoning behind Grant Thornton's intent to issue an adverse opinion appears to have existed, and should have been known by Grant Thornton, when it issued its audit report opinion as to TCA Management's 2017 financials on April 30, 2018.

61.     But, despite learning of the material and long-running issues that should have led to an adverse opinion for TCA Management's 2017 financial statement, Grant Thornton never sought to withdraw, amend or restate its 2017 opinion.

62.     Instead of proceeding with an adverse opinion or disclaimer for 2018, Grant Thornton provided TCA Management with a roadmap to obtain another qualified opinion.  Grant Thornton recommended obtaining an independent valuation of the SPVs and to ensure that various loans were consistent with the IFRS.  Assuming the independent valuation of the SPVs could be provided, Grant Thornton was willing to provide an opinion with qualifications as to only two line-items.  In other words, Grant Thornton offered to turn a blind eye to the significant accounting inconsistencies and improper controls so that TCA Management could continue to justify the deceptive business practices to investors.

63.     When offering the option to avoid an adverse opinion or disclaimer, Grant Thornton acknowledged that any opinion or disclaimer would be evaluated by investors in the Funds and it expressed willingness to work with TCA's directors and officers on the wording of such negative findings to minimize investor concerns.  These same investor-related concerns apparently led Grant Thornton to recommend proceeding with the independent valuation.

64.     Unsurprisingly, TCA Management accepted Grant Thornton's recommendation

and produced a purportedly independent third-party valuation of the SPVs.  Relying on these valuations, Grant Thornton prepared and finalized its qualified 2018 audit opinion — instead of the adverse opinion or disclaimer that it previously thought would be justified under the circumstances.

65.     TCA Management and Circle Partners included Grant Thornton's qualified opinion in TCA Management's 2018 financial statement for publication and dissemination to investors of the Funds.

66.     At bottom, Grant Thornton knew of the improper practices of certain TCA directors and officers and how TCA Management was misstating financial information to investors.  But instead of exposing those issues in its independent audits and revealing the financial deception, Grant Thornton gave TCA Management the opportunity to conceal and minimize its wrongful conduct.  TCA Management gladly accepted the help.

67.     Apart from the qualifications included in Grant Thornton's audit opinions, Grant Thornton certified in its opinions that the financial statements of the Master Fund "present fairly" the Fund's financial position.

68.     Indeed, through the final audit reports for 2017 and 2018, Grant Thornton provided TCA Management with a way to justify these severe accounting irregularities by granting it qualified audit opinions.  These opinions willfully disregarded what Grant Thornton knew: there was little to no backup for the tens of millions of dollars in unearned, unpaid, and/or unrecoverable "investment banking" fees, among other misconduct.

69.     Through its improper coordination with TCA Management, Grant Thornton prolonged TCA Management's scheme and exacerbated Plaintiffs' damages.  Grant Thornton's opinions, in its capacity as independent auditor, provided a false sense of security to Plaintiffs and

other investors, who relied on those opinions.  Moreover, these opinions helped TCA Management evade additional scrutiny from government regulators, which, in turn, allowed the scheme to continue.

### B.      Circle Partners

70.      Circle Partners became the fund administrator to the Feeder Funds and Master Fund in 2014 after an acquisition of its predecessor-in-interest in August 2014.

71.      Circle Partners acted as the administrator, registrar and transfer agent for the Feeder Funds and Master Fund.

72.      Among other things, Circle Partners was responsible for the following:  (i) maintaining the register of Shareholders; (ii) communicating with the Shareholders and sending financial statements to the Shareholders; (iii) providing registrar and transfer agent services in connection with the issuance, transfer and redemption of Shares of the Fund; (iv) overseeing compliance with applicable anti-money laundering laws in the Cayman Islands; (v) calculating the net asset value of the Shares in accordance with the Articles of Association; (vi) processing requests for redemption of Shares; (vii) keeping books and records of the Fund; (viii) preparing year-end financial statements for the Fund and (ix) performing other clerical services in connection with the day-to-day administration of the Fund.

73.      In connection with the monthly NAV calculations, Circle Partners' "Service Organizational Control Report," which establishes the basic standards under which Circle Partners offers its services, required reconciliation with third parties and that "all balance sheet items are substantiated with appropriate documentation."

74.      Notwithstanding the requirement that Circle Partners substantiate balance sheet items and reconcile with third parties, Circle Partners regularly deferred to TCA Management on

unsupported revisions to the NAV calculations and annual financial statements used for the audits. Numerous emails from Circle Partners' Chad Fairchild, who was based in Orlando, Florida, ask TCA Management if they are "comfortable" with the numbers, and an investigation has revealed that certain members of TCA Management would regularly revise the numbers through screen-shares and phone calls to avoid any written trail of the changes.  Circle Partners knew about and gladly accommodated these monthly, secretive unsupported revisions. Moreover, Circle Partners was copied on emails from Grant Thornton questioning the collectability of the investment banking advisory fees in early 2018, but continued to include those fees in the NAV calculations through 2018 and 2019.

75.     In addition, the NAV published by Circle Partners and disseminated to investors was inflated by $20 million in 2017 and $28 million in 2018.  Circle Partners learned of this discrepancy but continued to work with TCA Management.

76.     Circle Partners was aware of the gross discrepancies between the unaudited NAVs that it was publishing with TCA's Management's input and approval and audited NAVs, but continued to work with TCA Management to shield and obscure the true performance of the Funds by revising the NAVs and annual financial statements.

77.     In addition, Circle Partners responded to administrator questionnaires indicating that TCA Management's internal financial controls were effective, which Circle Partners knew to be false.  Likewise, Circle Partners provided false answers regarding risk monitoring.

78.     Circle Partners knew of the improper practices of certain of TCA's officers and directors and how TCA Management was misstating financial information to investors while purporting to measure the Funds' financial assets at "fair market value."  Instead of exposing those issues in its independent work and revealing TCA Management's ongoing deception, Circle

Partners gave TCA Management the opportunity to conceal and minimize its wrongful conduct. TCA Management gladly accepted the help from Circle Partners.  In exchange, TCA Management approved payment of tens of thousands of dollars in fees on a monthly basis.

79.     Through its improper coordination with TCA Management, Circle Partners prolonged TCA Management's scheme and exacerbated Plaintiffs' damages.  Circle Partners' financial calculations, in its capacity as fund administrator, provided a false sense of security to Plaintiffs and other investors.  Moreover, these calculations and opinions helped TCA Management evade additional scrutiny from government regulators, which, in turn, allowed the scheme to continue

**V.     Liquidation**

80.     On or about January 21, 2020, shortly after news broke about the TCA whistleblowers, the Fund sent notice to investors that the Master Fund was shutting down.  *See* Exhibit 3.

81.     TCA Management cited the SEC investigation as one reason for the shut-down.

82.     The Fund told investors it would take 12 to 18 months to liquidate all positions of the Master Fund.

83.     The Master Fund promised that a detailed strategy plan would be sent to all investors within thirty (30) days.

84.     No "detailed strategy plan" was sent to investors, however, and TCA Management and the Master Fund went dark, and even shut down their website.  The former website, tcaglobalfund.com, showed the following:



### VI.    The Securities and Exchange Commission's Enforcement Action

85.    Shortly after Plaintiffs filed this action against the Funds and their managers, the U.S. Securities and Exchange Commission brought a civil enforcement action against TCA Management and the general partner of the Funds, with the Master Fund and Feeder Funds named as relief defendants.  *See SEC v. TCA Fund Mgmt. Grp. Corp. et al.*, No. 1:20-cv-21964 (S.D. Fla.).   The SEC alleges violations of the Securities Act, Securities Exchange Act, and the Investment Advisers Act based on TCA Management's fraudulent revenue recognition practices that inflated the Master Fund's revenue and NAV.

86.    The SEC confirms in its filings that TCA Management's practices led to regular misrepresentations to investors based on the monthly profitability of the Funds.

87.    On May 11, 2021, Judge Altonaga appointed Jonathan Perlman, Esq., as receiver for the defendants and relief defendants. The Master Fund and Feeder Funds are therefore no longer in operation, and the SEC notes that the "Funds' current situation is grim."

## VII.   TCA Management Made Numerous Materially False and Misleading Statements and Omissions to Plaintiffs and Other Class Members

88.     Throughout the Class Period, TCA Management issued offering materials and audited financial statements to Plaintiff and class members that contained materially false information, including but not limited to the following:

  a.   Inflated NAV and historical returns that included bad loans and phantom investment advisory fees that were never earned, were uncollectable, and were based on false or deceptive loan documentation;

  b.   Misrepresented the objective of the Master Fund's business, which was not to make high interest loans that were to be repaid, but to make such loans to use in litigation to collect the assets of the subject borrowers through dozens of lawsuits filed around the country; and

  c.   Omitted and minimized material accounting irregularities and severe control issues from public audit opinions, while giving TCA Management the opportunity to conceal and justify these issues.

89.     The above misrepresentations and omissions were material to Plaintiff and the other investors' evaluation of the Fund, and their decision to invest in, and continue to maintain their respective investments, in the Fund.

## VIII.   Grant Thornton Had Actual Knowledge of TCA Management's Fraud and Breaches of Fiduciary Duty

90.     As alleged above, Grant Thornton had actual knowledge of the conduct of certain members of TCA Management's officers and directors, TCA Management's fiduciary duties to Plaintiffs and TCA Management's breach of those fiduciary duties.  Grant Thornton knew that:

  a.   TCA Management lacked support for tens of millions of dollars in purported revenues, including "advisory fees" and "investment banking fees" to borrowers who advised Grant Thornton that no such services had even been requested from or provided by TCA Management;

  b.   TCA lacked support for tens of millions of dollars in loan receivables to borrowers;

  c.   TCA Management lacked support for its loans to third parties;

d.  TCA Management valued certain assets not in accordance with accounting standards;

e.  TCA Management improperly timed the recognition of its income in violation of accounting standards;

f.  TCA Management improperly classified its loans in violation of accounting standards;

g.  TCA Management lacked evidence to support the collectability of its loans;

h.  Litigation outcomes relating to TCA Management's enforcement of bad loans were exaggerated;

i.  Certain of TCA Management's directors and officers had overridden controls aimed at preventing fraud or overreaching;

j.  TCA Management improperly valued SPVs; and

k.  TCA Management lacked adequate records maintenance and loan management systems.

**IX.**     **Grant Thornton Substantially Assisted the Fraud and Fiduciary Breaches**

91.  As also alleged in detail above, Grant Thornton substantially assisted TCA Management's fraud and breaches of fiduciary duty by:

a.  Failing to include in its final 2017 audit report what it new about the serious control issues, revenue recognition deficiencies, loan receivables and accounting issues that eventually led to TCA Management's failure;

b.  Failing to disclose that it could not confirm with borrowers 90% of investment banking fees purportedly owed to TCA Management;

c.  Failing to issue an adverse opinion in 2018, suggesting instead that TCA Management obtain a third-party valuation company to obscure TCA Management's issues and allow Grant Thornton to rely on that valuation to issue another qualified opinion;

d.  Deviating from its normal practices, procedures and methodologies in violation of industry standards;

e.  Ignoring data in its possession that contradicted conclusions reached in its audit reports; and

f.  Lending its name and credibility to TCA Management.

### X.   At the Very Least, Grant Thornton Made Negligent Misrepresentations and Omissions

92.     At the very least, Grant Thornton's audit reports contained material omissions along with untrue statements that it should have known were false.  For example:

   a.   Grant Thornton stated that the Master Fund's financial statements "present fairly";

   b.   Grant Thornton failed to include in its final 2017 audit report the serious control issues, revenue recognition deficiencies, loan receivables and accounting issues that eventually led to TCA Management's failure;

   c.   Grant Thornton failed to disclose that it could not confirm with borrowers 90% of investment banking fees purportedly owed to TCA Management;

   d.   Grant Thornton failed to disclose that TCA Management had inadequate procedures with which to comply with basic accounting standards;

   e.   Grant Thornton failed to disclose that TCA Management had no documented means or timeframe for the repayment of certain loans; and

   f.   Grant Thornton failed to state that TCA Management's revenue recognition policies had systemic deficiencies, instead minimizing the issue as limited to investment banking income recognition.

93.     Grant Thornton knew that the results of its audits would be relied upon by investors. Grant Thornton knew that TCA Management touted Grant Thornton's "independent" audits in communications with investors, inducing Plaintiffs' and investors' investments in the Funds and continued investment holdings in the Funds.

94.     Had Plaintiffs and investors known of the acts described herein and/or the true value and issues plaguing TCA Management's investments that Grant Thornton knew about and failed to disclose, Plaintiffs and investors would not have initiated their investments in the Funds and/or would have withdrawn their entire investments in the Funds.

95.     Plaintiffs and investors were unaware of, nor could they have discovered through the exercise of reasonable diligence, the materially false and misleading representations and

omissions regarding the audit reports because they did not have access to TCA Management's financial records.

96.     Grant Thornton actually knew that prospective and current investors, including Plaintiffs, would receive its audit reports and rely to their detriment upon the above misrepresentations and omissions, and, indeed, intended for such investors and Plaintiffs to rely on those misrepresentations and omissions.  Grant Thornton actually knew that Plaintiffs and investors would use the audit reports to make the decision to invest and/or to retain their investment in TCA Management.

97.     Plaintiffs and the other investors were reasonable in relying upon the misrepresentations and omissions in the audited financial statements prepared by Grant Thornton.

**XI.     Circle Partners Had Actual Knowledge of TCA Management's Fraud and Breaches of Fiduciary Duty**

98.     As alleged above, Circle Partners had actual knowledge of the misconduct of certain members of TCA Management, TCA Management's fiduciary duties to Plaintiffs and TCA Management's breach of those fiduciary duties.  Circle Partners knew that:

  a.   TCA Management's NAV was inflated by at least $20 million in 2017 and at least $28 million in 2018 under the audited numbers, which does not even account for the fraudulent investment banking fees that further inflated the NAV;

  b.   Certain members of TCA Management were altering NAV calculations and financial statements after the numbers were calculated in order to smooth out the monthly returns and perpetuate the appearance of a reliable investment vehicle; and

  c.   TCA Management's investment banking advisory fees were mostly uncollectible.

**XII.     Circle Partners Substantially Assisted the Fraud and Fiduciary Breaches**

99.     As also alleged in detail above, Circle Partners substantially assisted the fraud perpetrated by certain members of TCA Management and breaches of fiduciary duty by:

  a.   Publishing inflated NAVs and disseminating to investors;

b.   Stating that TCA Management's internal controls were effective;

c.   Providing false answers to third parties regarding TCA Management's risk monitoring capabilities; and

d.   Allowing TCA Management to alter NAV calculations and financial statements.

## XIII.   At the Very Least, Circle Partners Made Negligent Misrepresentations and Omissions

100.   At the very least, Circle Partners' valuation reports contained material omissions along with untrue statements that it should have known were false:

a.   NAVs were inflated by tens of millions of dollars in 2017 and 2018;

b.   TCA Management's internal controls were effective; and

c.   TCA Management had adequate risk monitoring capabilities.

101.   Circle Partners knew that the results of its calculations would be relied upon by investors.   Circle Partners disseminated audit reports and other financial communications containing those calculations directly to investors, including Plaintiffs.

102.   Had Plaintiffs and investors known of the acts described herein and/or the true financial position that Circle Partners knew about and failed to disclose, Plaintiffs and investors would not have initiated their investments in the Funds and/or would have withdrawn their entire investments in the Funds.

103.   Plaintiffs and investors were unaware of, nor could they have discovered through the exercise of reasonable diligence, the materially false and misleading representations and omissions regarding TCA's finances and NAVs because they did not have access to TCA Management's financial records.   As outsiders, Plaintiffs and investors did not know TCA Management was manufacturing fees to inflate the NAVs or that many of the loans were uncollectable.

104.    Circle Partners actually knew that prospective and current investors, including Plaintiffs, would receive audit reports and other financial information containing Circle Partners' financial calculations and rely to their detriment upon the above misrepresentations and omissions, and, indeed, intended for such investors and Plaintiffs to rely on those misrepresentations and omissions.  Circle Partners actually knew that Plaintiffs and investors would use the information to make the decision to invest and/or to retain their investment in TCA Management.   As administrator, Circle Partners sent the audit reports and information directly to Plaintiffs and investors.

105.    Plaintiffs and the other investors were reasonable in relying upon the misrepresentations and omissions in the audited financial statements prepared by Grant Thornton.

## **CLASS ACTION ALLEGATIONS**

106.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and/or (b)(3) on behalf of themselves and a nationwide class consisting of:

> All investors who purchased or otherwise held a beneficial interest in one or more of the TCA funds on January 21, 2020 (the "Class").

107.    The Class Period begins when the earliest Class member made its investment in one or more of the TCA funds and continued to hold a beneficial interest in the Master Fund through January 21, 2020.

108.    The Class excludes Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, legal representatives, successors, and assigns, and Defendants' immediate family members.

109.    **Numerosity**.  Based on TCA Management's SEC disclosures, the Fund had approximately four hundred beneficial owners at the time it discontinued redemptions and began dissolution.

110.   **Typicality**.  Plaintiffs' claims are typical of the claims of the Class insofar as Plaintiffs similarly owned a beneficial interest in the Master Fund at the time redemptions ceased and dissolution began, and were therefore harmed by the same wrongful activity as other Class members.

111.   **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the Class and do not have any claims that are antagonistic to those of the Class. Plaintiffs have retained counsel experienced in complex nationwide class actions, including securities litigation. Plaintiffs' counsel will fairly, adequately, and vigorously protect the interests of the Class.

112.   **Commonality and Predominance**.   Common questions of law and fact predominate over any questions affecting individual Class members, including, but not limited to, the following:

a.  Whether Grant Thornton and Circle Partners' unaudited and audited financial statements, and published NAVs, contained material misrepresentations and/or omissions of material fact that induced Class members' initial and continued investment in the Fund until the dissolution was announced and redemptions were suspended;

b.  Whether Grant Thornton and Circle Partners aided and abetted breaches of fiduciary duties to Plaintiffs and the Class by artificially inflating the NAVs and reported assets of the Master Fund, and by ignoring significant institutional controls and financial accounting guidelines;

c.  Whether Grant Thornton's audit reports contained material misrepresentations and/or omissions;

d.  Whether Circle Partners' NAV calculations and unaudited financial statements were "cooked" with its aid, knowledge and/or consent;

e.  Whether Grant Thornton and/or Circle Partners had actual or constructive knowledge of the misrepresentations and breaches of fiduciary duty;

f.  Whether Grant Thornton and/or Circle Partners substantially assisted the scheme; and

g.   Whether Plaintiffs and Class members were damaged as a result of Defendants' conduct.

113.   **Superiority.**   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   The burden and expense of managing many actions arising from the scheme perpetrated by TCA Management and the Defendants, and the potential for inconsistent results, counsel in favor of a class action — which presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## EQUITABLE TOLLING AND DISCOVERY OF THE WRONGDOING

114.   As a result of Defendants' conduct, Plaintiffs and Class members were not aware of the financial misconduct and were prevented from learning the facts necessary to commence an action against Defendants for the wrongful conduct alleged in this Complaint until the SEC receivership was instituted and access to underlying accounting documents was provided to class counsel. The facts necessary for Plaintiffs to formulate the basis of a complaint and satisfy applicable pleading standards were within the exclusive control of TCA Management, Grant Thornton, and Circle Partners.   Rather than disclosing that information to Plaintiffs and the Class, Grant Thornton and Circle Partners assisted TCA Management in concealing it.

115.   Plaintiffs and the members of the Class have acted diligently in seeking to bring their claims promptly. Because of Defendants' active steps — including, but not limited to, their assistance in concealing the material information detailed above — Plaintiffs assert the applicable statute of limitations for Plaintiffs and the Class's claims were tolled, and Defendants are equitably estopped from asserting any statute of limitations defense.

116.   Defendants are equitably estopped from asserting that any otherwise applicable period of limitations has run.

117.     In addition, as a result of Defendants' assistance in concealing the negligent misrepresentations, breaches of fiduciary duties, and other wrongdoing, Plaintiffs and Class members were prevented from discovering their claims against Defendants until recently.

118.     Accordingly, the discovery rule also applies to toll the statute of limitations in this case.

**CAUSES OF ACTION**

**COUNT I**
**Negligent Misrepresentation**
**(Directly Against Grant Thornton)**

119.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 17, 19 through 69, 80 through 97, and 106 through 118 as if set forth in full herein.

120.     This is a direct action against Grant Thornton for negligent misrepresentation.

121.     Grant Thornton made misrepresentations and omissions of material fact in its audit opinions for 2017 and 2018 by, among other things, minimizing and concealing the fact that TCA Management (i) engaged in and implemented grossly improper accounting policies that resulted in misrepresentation of the NAV, (ii) improperly reported false advisory fee income, (iii) operated under significant control issues, and (iv) were otherwise engaged in a fraudulent venture.  Having made various affirmative statements in its audit opinions regarding its evaluation of TCA Management, Grant Thornton should have disclosed the entirety of its knowledge of TCA Management' wrongful conduct. Grant Thornton thus issued misleading opinions stating that, except for the listed qualifications, the financials of the Master Fund and Feeder Funds were fairly presented.

122.     Grant Thornton should have known that those statements and material omissions were false and misleading when made.

31

123.    Grant Thornton made the false representations and omitted material facts intending to induce Plaintiffs and Class members to rely on the representations and invest in beneficial ownership interests in the Master Fund or maintain their investments.

124.    Plaintiffs and Class members justifiably relied on Grant Thornton's false representations and non-disclosures in investing and taking a beneficial ownership interest in the Master Fund and, as a result, were injured insofar as their interests have declined in value materially.

125.    Grant Thornton's actions were so reckless or wanting in care that they constitute a conscious disregard or indifference to the rights of the Plaintiffs and Class members. Thus, Plaintiffs and Class members are entitled to an award of punitive damages.

**<u>Count II</u>**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Directly Against Grant Thornton)**

126.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 17, 19 through 69, 80 through 97, and 106 through 118 as if set forth in full herein.

127.    TCA Management was a registered investment advisor under the IAA.

128.    TCA Management and its controlling directors and managers owed a fiduciary duty to the Master Fund, Feeder Funds, and their beneficial owners, including Plaintiffs and Class members. Specifically, TCA Management offered investment advice and managed the pooled investment of the Master Fund for the beneficial owners thereof.

129.    As such, TCA Management and its controlling directors and managers owed fiduciary duties to all beneficial owners of the Master Fund.

130.    Based on its knowledge of TCA Management's business model and lending activity, Grant Thornton knew that TCA Management owed fiduciary duties to investors, including

Plaintiffs.  Grant Thornton also knew that TCA Management had discretion and control giving rise to a fiduciary duty and duty of care to Plaintiffs and investors.

131.    As described herein, certain officers and directors of TCA Management breached their fiduciary duties by (1) causing and failing to inform the beneficial owners of the Master Fund that the NAV was artificially inflated with phantom advisory fees and bad loans, (2) failing to disclose that the true business model was to make high interest loans in order to seize borrowers' assets, (3) and by failing to disclose the material information about Press's background, among other things.

132.    As a direct and proximate result of these breaches of their fiduciary duties, Plaintiffs and Class members were damaged.

133.    Grant Thornton knew that TCA Management owed fiduciary duties to the beneficial owners of the funds, including Plaintiffs and the class. Grant Thornton analyzed the structure of the Master Fund and Feeder Funds, along with the roles played by TCA Management and its controlling directors and managers.  Grant Thornton also knew that investors in the Funds were the beneficial owners and that they relied on TCA Management for the investment and administration of their money.

134.    Grant Thornton substantially assisted in TCA Management's breaches of fiduciary duty with knowledge that TCA Management were breaching those duties.  Through its evaluation, Grant Thornton identified the severe control issues and lack of support for the Master Fund and Feeder Funds' purported assets as early as April 2018.  Grant Thornton also learned that TCA Management's stated assets were based on TCA Management's unreasonable estimates of collectability and valuations.   Grant Thornton therefore knew that TCA Management was

misrepresenting material facts to Plaintiffs and the class members, using their position to make improper investments, and concealing its wrongdoing.

135.     Grant Thornton substantially assisted TCA Management by providing qualified audit opinions that concealed or downplayed the wrongful financial conduct of TCA Management. Grant Thornton prepared its audit opinion for 2017 while omitting or mischaracterizing the significant issues it identified during its audit.  Similarly, the 2018 audit opinion was the product of active coordination between Grant Thornton and TCA Management to avoid an adverse opinion or disclaimer, which would have revealed to Plaintiffs and the Class members (and government entities) a more complete picture of TCA Management's scheme. Grant Thornton thus issued misleading opinions stating that, except for the listed qualifications, the financials of the Master Fund and Feeder Funds were fairly presented.

136.     As a direct and proximate result of Grant Thornton's aiding and abetting TCA Management' breaches of fiduciary duty, Plaintiffs and class members have suffered damages in an amount to be determined at trial.

**Count III**
**Aiding and Abetting Fraud**
**(Directly Against Grant Thornton)**

137.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 17, 19 through 69, 80 through 97, and 106 through 118 as if set forth in full herein.

138.     Certain officers and directors of TCA Management defrauded the Plaintiffs and the class members by misrepresenting and/or omitting the nature and value of the Master Fund and Feeder Funds' stated assets, the true business model of TCA Management, and the material information about Press's background, among many other things set forth above.  Certain officers and directors of TCA Management knowingly engaged in a scheme to defraud Plaintiffs and the

class members by including unverifiable, unearned, and/or uncollectable debt in the NAV, misrepresenting how the Master Fund generated income through its loan business, and omitting Press's history of improper conduct.

139.    As the independent auditor for the Master Fund and the Feeder Funds, Grant Thornton was responsible for determining whether their financials were fairly presented, including the valuations presented therein and the valuation metrics or estimates used by management.  Grant Thornton was also responsible for identifying the potential for material misstatements and improper accounting policies or practices.

140.    Based on its evaluation, Grant Thornton knew that certain officers and directors of TCA Management were misrepresenting the financial status of the funds to Plaintiffs and the Class members.  Grant Thornton identified severe control issues and lack of support for the Master Fund and Feeder Funds' purported assets as early as April 2018.  Grant Thornton also learned that the funds' stated assets were based on TCA Management's unreasonable estimates of collectability and valuations.   Grant Thornton therefore knew that certain officers and directors of TCA Management were misrepresenting material facts to Plaintiffs and the class members, using its position to make improper investments, and concealing its wrongdoing.

141.    Grant Thornton substantially assisted TCA Management's scheme with knowledge that certain officer and directors of TCA Management were misrepresenting the financial status of the Funds to Plaintiffs and the Class members. Grant Thornton provided TCA Management with qualified audit opinions that concealed or downplayed the wrongful conduct of certain officers and directors of TCA Management.  Grant Thornton prepared its audit opinion for 2017 while omitting or mischaracterizing the significant issues it identified during its audit.  Similarly, the 2018 audit opinion was the product of active coordination between Grant Thornton and TCA Management to

avoid an adverse opinion or disclaimer, which would have revealed to Plaintiffs and the Class members (and government entities) a more complete picture of TCA Management's actual financial strength and condition. Grant Thornton thus issued misleading opinions stating that, except for the listed qualifications, the financials of the Master Fund and Feeder Funds were fairly presented.

142.    Plaintiffs and Class members justifiably relied on these misstatements, omissions and acts by certain officers and directors of TCA Management, as assisted by Grant Thornton, to their detriment by investing or continuing to hold their investments in the Feeder Funds and Master Fund.  Grant Thornton also knew that its audit opinions would be analyzed by investors in deciding whether to invest, hold their investments, or make additional investments in the Funds.  Grant Thornton also knew that a negative audit finding may cause investors to redeem their investments or take action against TCA Management.

143.    As a direct and proximate result of Grant Thornton's aiding and abetting certain officers and directors of TCA Management's scheme, Plaintiffs and class members have suffered damages in an amount to be determined at trial.

### COUNT IV
### Negligent Misrepresentation
### (Directly Against Circle Partners)

144.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 16, 18 through 40, 70 through 89, and 98 through 118 as if set forth in full herein.

145.    This is a direct action against Circle Partners for negligent misrepresentation.

146.    Circle Partners made misrepresentations of material fact in its published monthly Net Asset Values and year-end financial statements beginning in 2014, when it began its work as the administrator, through closure of the funds in 2020.  By permitting TCA to dictate and revise

the NAV calculations and financial statements without proper supporting documentation, as required by Circle Partners' own internal standards, and by failing to recognize that certain "advisory fees" and "investment banking fees" were not going to be collected, Circle Partners minimized and concealed the fact that certain officers and directors of TCA Management (i) engaged in and implemented grossly improper accounting policies that resulted in misrepresentation of the NAV, (ii) improperly reported false advisory fee income, (iii) operated under significant control issues, and (iv) were otherwise engaged in a fraudulent venture.

147.    Circle Partners should have known that its monthly NAV statements, and year-end financial statements used to support Grant Thornton's audits, were false and misleading when made.

148.    Circle Partners made the false representations and omitted material facts intending to induce Plaintiffs and Class members to rely on the representations and invest in beneficial ownership interests in the Master Fund or maintain their investments.

149.    Plaintiffs and Class members justifiably relied on Circle Partners' false representations and non-disclosures in investing and taking a beneficial ownership interest in the Master Fund and, as a result, were injured insofar as their interests have declined in value materially.

150.    Circle Partners' actions were so reckless or wanting in care that they constitute a conscious disregard or indifference to the rights of the Plaintiffs and Class members. Thus, Plaintiffs and Class members are entitled to an award of punitive damages.

**Count V**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Directly Against Circle Partners)**

151.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 16, 18 through 40, 70 through 89, and 98 through 118 as if set forth in full herein.

152.    TCA Management was a registered investment advisor under the IAA.

153.    TCA Management and its controlling directors and managers owed a fiduciary duty to the Master Fund, Feeder Funds, and their beneficial owners, including Plaintiffs and Class members. Specifically, TCA Management offered investment advice and managed the pooled investment of the Master Fund for the beneficial owners thereof.

154.    As such, TCA Management and its controlling directors and managers owed fiduciary duties to all beneficial owners of the Master Fund.

155.    Based on its knowledge of TCA Management's business model and lending activity, Circle Partners knew that TCA Management owed fiduciary duties to investors, including Plaintiffs.  Circle Partners also knew that TCA Management had discretion and control giving rise to a fiduciary duty and duty of care to Plaintiffs and investors.

156.    As described herein, certain officers and directors of TCA Management breached their fiduciary duties by (1) causing and failing to inform the beneficial owners of the Master Fund that the NAV was artificially inflated with phantom advisory fees and bad loans, (2) failing to disclose that the true business model was to make high interest loans in order to seize borrowers' assets, (3) and by failing to disclose the material information about Press's background, among other things.

157.    As a direct and proximate result of certain officers and directors of TCA Management' breaches of their fiduciary duties, Plaintiffs and Class members were damaged.

158.     Circle Partners knew that TCA Management owed fiduciary duties to the beneficial owners of the funds, including Plaintiffs and the Class members. Circle Partners analyzed the finances of the Master Fund and Feeder Funds on a monthly and annual basis — as a critical outside "check" on TCA Management.  Circle Partners also knew that investors in the Funds were the beneficial owners and that they relied on TCA Management for the investment and administration of their money.   Indeed, Circle Partners was responsible for client relations on behalf of TCA Management, among other things.

159.     Circle Partners substantially assisted in certain officers and directors of TCA Management's breaches of fiduciary duty with knowledge that these individuals were breaching those duties.  Through its monthly and annual financial evaluations, Circle Partners was aware of the lack of support for the Master Fund and Feeder Funds' purported assets, as claimed by TCA Management.  Circle Partners also learned that the Funds' purported assets were overstated based on the 2017 and 2018 audited financial reports issued by Grant Thornton, but continued to publish Net Asset Values and unaudited financial statements that overstated the assets of the Funds in 2018 and 2019 anyway.   Circle Partners knew that certain officers and directors of TCA Management were misrepresenting material facts to Plaintiffs and the Class members, using their position to make improper investments, and concealing its wrongdoing.

160.     Circle Partners substantially assisted TCA Management by providing monthly Net Asset Values and unaudited financial statements for the Funds that concealed or downplayed the inflated and uncollectible assets placed on the books by TCA Management.  Circle Partners prepared monthly NAVs and yearly unaudited financial statements while allowing certain officers and directors of TCA Management to manipulate the numbers without supporting documentation, in violation of Circle Partners' internal standards.   Circle Partners coordinated with TCA

Management on a monthly basis to allow for, and then conceal, this manipulation.  Circle Partners thus issued misleading NAVs and financial statements that grossly overvalued the Feeder Funds' and Master Fund's assets and induced Plaintiffs and the Class members to invest in the Funds and/or not withdraw their investments.  Circle Partners knew the NAVs were inflated because, among other reasons, even Grant Thornton stated that they were overvalued.

161.     As a direct and proximate result of Circle Partners' aiding and abetting TCA Management' breaches of fiduciary duty, Plaintiffs and Class members have suffered damages in an amount to be determined at trial.

**Count VI**
**Aiding and Abetting Fraud**
**(Directly Against Circle Partners)**

162.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 16, 18 through 40, 70 through 89, and 98 through 118 as if set forth in full herein.

163.     Certain officers and directors of TCA Management misrepresented and omitted the nature and value of the Master Fund and Feeder Funds' stated assets, the true business model of TCA Management, and the material information about Press's background, among many other things.  Certain officers and directors of TCA Management knowingly engaged in a scheme to defraud Plaintiffs and the class members by including unverifiable, unearned, and/or uncollectable debt in the NAV, misrepresenting how the Master Fund generated income through its loan business, and omitting Press's history of improper conduct.

164.     As the administrator for the Master Fund and the Feeder Funds, Circle Partners was responsible for determining the Net Asset Value on a monthly basis, based on supporting materials, among other things, including the valuations presented therein and the valuation metrics or

estimates used by management.  Circle Partners was also responsible for the annual, unaudited financial statements that were used by Grant Thornton to perform its audits.

165.    Based on its ongoing evaluations of the Funds' financials, Circle Partners knew that certain TCA directors and officers were misrepresenting the financial status of the funds to Plaintiffs and the Class members.  Indeed, the audited financial reports made that obvious, identifying more than $40 million in discrepancies between the unaudited NAV values and the audited NAV values for years 2017 and 2018.  In addition, Circle Partners knew or should have known that the investment banking income, some of which was held on the books for years without any collection, lacked support for the Master Fund and Feeder Funds' purported assets.  Circle Partners also coordinated unsupported revisions to the NAV on a monthly basis with TCA Management.  Circle Partners therefore knew that certain officers and directors of TCA Management were misrepresenting material facts to Plaintiffs and the class members, using its position to make improper investments, and concealing its wrongdoing.

166.    Circle Partners substantially assisted with knowledge that certain officers and directors of TCA Management were misrepresenting the financial status of the Funds to Plaintiffs and the Class members. Circle Partners provided TCA Management with monthly NAVs and unaudited yearly financial statements that concealed the wrongful conduct, which was manipulating the numbers to create the appearance of steady returns.  Circle Partners prepared its monthly NAVs and financial statements while omitting or mischaracterizing the significant issues it identified during its work with TCA Management.  Circle Partners even continued to miscalculate the NAV values after learning, through Grant Thornton's 2017 audit, that the audited NAV was worth over $20 million less than the number used by Circle Partners.  That error compounded through 2018 and 2019.

167.    The inaccurate NAVs and financial statements were the product of active coordination between Circle Partners and TCA Management to avoid an adverse reporting on the performance of the Funds, which would have revealed to Plaintiffs and the Class members (and government entities) a more complete picture of TCA Management's financial condition. Circle Partners thus issued misleading opinions about the value of the Funds on a monthly and annual basis.

168.    Plaintiffs and Class members justifiably relied on these misstatements, omissions and acts by certain officers and directors of TCA Management, as assisted by Circle Partners, to their detriment by investing or continuing to hold their investments in the Feeder Funds and Master Fund.  Circle Partners also knew that its NAV calculation would be analyzed by investors in deciding whether to invest, hold their investments, or make additional investments in the Funds. Circle Partners also knew that a negative return in the Funds may cause investors to redeem their investments or take action against TCA Management.

169.    As a direct and proximate result of Circle Partners' aiding and abetting, Plaintiffs and class members have suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs' counsel as Class counsel;

B.    Awarding compensatory damages to Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be determined at trial;

C.      Awarding punitive damages to Plaintiffs and the Class against Defendants for the legal Counts;

D.      Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the extent permitted by law;

E.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

F.      Granting Plaintiffs and the Class appropriate equitable relief; and

G.      Granting such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted:  September 2, 2022

**WEINBERG WHEELER HUDGINS**
**GUNN & DIAL, LLC**

/s/Aaron M. Cohn
Aaron M. Cohn, Esq.
Florida Bar No.: 95552
Weinberg Wheeler Hudgins
Gunn & Dial, LLC
2601 South Bayshore Drive
Suite 1500
Miami, FL 33133
T: (305) 455-9500
F: (305) 455-9501
E-mail: acohn@wwhgd.com
dmallqui@wwhgd.com
mferrer@wwhgd.com
*Counsel for Plaintiffs*

**SILVER LAW GROUP**

/s/ Scott L. Silver
Scott L. Silver
Fla. Bar No. 095631
11780 W. Sample Road
Coral Springs, Florida 33065
T: (954) 755-4799
F: (954) 755-4684
E-mail: ssilver@silverlaw.com
rfeinberg@silverlaw.com
*Counsel for Plaintiffs*

**GIBBS LAW GROUP LLP**

/s/ David Stein
David Stein (*pro hac vice* to be submitted)

**LEVINE KELLOGG LEHMAN**
**SCHNEIDER + GROSSMAN LLP**

/s/ Jason Kellogg

Kyla J. Gibboney (*pro hac vice* to be submitted)
505 14th Street, Suite 1110
Oakland, CA 94612
T: (510) 350-9700
F: (510) 350-9701
E-mail: ds@classlawgroup.com
kjg@classlawgroup.com
*Counsel for Plaintiffs*

Jeffrey C. Schneider, P.A.
Florida Bar No. 933244
Primary: jcs@lklsg.com
Secondary: ph@lklsg.com
Jason K. Kellogg, P.A.
Florida Bar No. 0578401
Primary: jk@lklsg.com
Secondary: ame@lklsg.com
Victoria J. Wilson
Florida Bar. No. 0092157
Primary: vjw@lklsg.com
Secondary: cf@lklsg.com
Marcelo Diaz-Cortes
Florida Bar No. 118166
Primary: md@lklsg.com
Secondary: cf@lklsg.com

Miami Tower
100 SE 2nd Street, 36th Floor
Miami, Florida 33131
Telephone: 305.403.8788
Facsimile: 305.403.8789

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 2, 2022, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF.

By: *Jason Kellogg*