United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Todd Benjamin International, Ltd. and Todd Benjamin, individually and on behalf of others similarly situated, Plaintiffs, | ) ) ) ) ) | |
| v. | ) ) | Civil Action No. 20-21808-Civ-Scola |
| Grant Thornton International, Ltd., Grant Thornton Cayman Islands, Grant Thornton Ireland, Bolder Fund Services (USA), and Bolder Fund Services (Cayman), Defendants. | ) ) ) ) ) ) | |

## Order on Motion to Dismiss Amended Complaint

This matter is before the Court on the joint motion to dismiss the amended complaint filed by Defendants Grant Thornton Cayman Islands ("GT Cayman"), Grant Thornton Ireland ("GT Ireland"), Grant Thornton International Ltd. ("GTIL," and with GT Cayman and GT Ireland, the "GT Defendants"), Bolder Fund Services (USA), LLC ("Bolder USA") and Bolder Fund Services (Cayman), Ltd. ("Bolder Cayman," with Bolder USA, the "Bolder Defendants," and collectively with the GT Defendants, the "Defendants"). (Mot. Dismiss, ECF No. 58.) Plaintiffs Todd Benjamin International, Ltd. ("TBIL") and Todd Benjamin ("Mr. Benjamin," and collectively, the "Plaintiffs") have responded in opposition. (Resp., ECF No. 68.) The Defendants have replied in support of their motion. (Reply, ECF No. 82.) Having reviewed the briefing, the record, and the relevant legal authority, the Court **grants in part** and **denies in part** the motion to dismiss. (**ECF No. 58**.)

### 1. Background

The Plaintiffs in this investment dispute represent a class of 400 individuals and corporations located both domestically and abroad who invested in a now-defunct Cayman Islands-based hedge fund managed by a Florida corporation. (Am. Compl. ¶¶ 1-2, 109, ECF No. 21.)  They bring claims of negligent misrepresentation, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty against a group of domestic and foreign defendant entities responsible for the foreign fund's accounting and audit work. The Plaintiffs say they relied upon fraudulent information provided by

the GT Defendants and the Bolder Defendants in choosing to invest in, and retaining their investments in, the foreign fund. (*Id.* ¶ 36.)

Plaintiff Todd Benjamin is a resident of the United Kingdom and a United States citizen. (*Id.* ¶ 2.)  Plaintiff TBIL is a legal entity incorporated in the United Kingdom. (*Id.* ¶ 1.)

GT Cayman and GT Ireland are legal entities organized under the laws of the Cayman Islands and Ireland, respectively. (*Id.* ¶¶ 4-5.) They each provide investment fund auditing services. (*Id.* ¶ 45.) GTIL is a legal entity incorporated in England and Wales and headquartered in London, England, United Kingdom. (*Id.* ¶ 3.) According to the Engagement Letters relied upon in the pleadings, GTIL is an organization of independently owned and managed accounting and consulting firms. (ECF No. 58-4 at 19.) GTIL coordinates strategy among its member firms, which include GT Cayman and GT Ireland. (Am. Compl. ¶ 43.)

Bolder USA is a Delaware limited liability company with its principal place of business in Orlando, Florida. (*Id.* ¶ 6.)  Bolder USA was formerly named Circle Investment Support Services (USA), LLC before changing its name in October 2021. (*Id.*) Bolder Cayman is a legal entity organized under the laws of the Cayman Islands. (*Id.* ¶ 7.)  Bolder Cayman was formerly named Circle Investment Support Services (Cayman), Ltd. before changing its name in October 2021. (*Id.*) The Bolder Defendants (before their name change, the "Circle Partners") offer administrative services for investment funds, including help with investor relations and communications, financial accounting, and generation of monthly "Net Asset Value" calculations used to value client investments at a given time. (*Id.* ¶ 72.)

TCA Fund Management Group Corp. d/b/a TCA Fund Management Group ("TCA Management") is an SEC-registered investment management advisory service located in Aventura, Florida. (*Id.* ¶ 8.) Beginning in September of 2011, TCA Management managed and provided investment advisory services to three pooled investment vehicles (together, "the Funds"), all of which were located in the Cayman Islands: (1) the TCA Global Credit Master Fund, L.P. (the "Master Fund"); (2) TCA Global Credit Fund, L.P.; and (3) TCA Global Credit Fund, Ltd.  (together with TCA Global Credit Fund, L.P., the "Feeder Funds"). (*Id.* ¶¶ 20-25.)

The Feeder Funds raised money by selling securities and fed the monies raised into the Master Fund. (*Id.* ¶ 20-25.) TCA Global Credit Fund, L.P. invested its assets in the Master Fund and served as the vehicle for investment in the Master Fund by U.S. citizens. (*Id.*) TCA Global Credit Fund, Ltd. invested its assets in the Master Fund and served as the vehicle for investments in the Master Fund by foreign citizens. (*Id.*) The Master Fund was used for short-

term, senior secured, direct lending to micro- and small-cap companies in need of capital. (*Id.* ¶ 22.)

GT Ireland and GT Cayman provided independent auditing services to evaluate TCA Management's statements of financial positions for the Funds for 2017 and 2018 and TCA Management's accounting policies for reasonableness of their accounting estimates in conjunction with these audits. (*Id.* ¶ 41.) Following email and telephonic communications, as well as two in-person meetings in Florida with TCA Management attended by GT Ireland and GT Cayman representatives, Engagement Letters describing the agreement for auditing services were finalized (ECF No. 21 ¶¶ 17, 56; ECF No. 58-4 at 48.) These Engagement Letters, signed by GT Cayman, GT Ireland, and the General Partner of the Funds (the Director of TCA Global Credit GP, Ltd.), contained a choice of law provision and an exclusive forum selection clause binding the parties to the agreement to Cayman Islands law and jurisdiction. (ECF No. 58-1 at 11, 16.) Throughout 2018 and into 2019, GT Ireland and GT Cayman continued to email and telephone TCA Management officers in Florida in relation to the 2017 and 2018 audits, with one more in-person meeting occurring in November of 2018 attended by GT Ireland representatives. (Am. Compl. ¶ 17.)

The Bolder Defendants, acting as Circle Partners at the time, became administrators to the Funds in August 2014. (*Id.* ¶ 70). The Bolder Defendants provided administrative services to the Funds by helping with investor relations, providing financial accounting services, and generating monthly "Net Asset Value" calculations used to value client investments in the Funds at any given time. (*Id.* ¶¶ 18, 72.) Investors were required to sign Subscription Documents that outlined the terms of the investment agreement anytime they contributed to the Funds. (ECF No. 58-1 at 16.) These Subscription Documents constituted agreements between Circle Partners and the General Partner of the Funds (TCA Global Credit Fund GP, Ltd.), and their terms were read and signed by investors during each transaction. (ECF No. 58-1 at 3, 6-7.) Section 16 of the Subscription Documents include the following choice of law provision and forum selection clause:

> The Subscription Agreement will be governed by and construed in accordance with the laws of the Cayman Islands, without regard to conflict of laws principles. The Subscriber submits to the exclusive jurisdiction of the Cayman Islands courts with respect to any actions against the Partnership, the General Partner, the Investment Manager and the Administrator.

Plaintiffs TBIL and Mr. Benjamin invested in the Master Fund beginning in or about June 2018 and June 2019, respectively. (Am. Compl. ¶¶ 31, 33.) At the time of making their investments, the Plaintiffs relied on the accuracy of information made available to them by TCA Management, Circle Partners, and the GT Defendants—including the offering documents, TCA Management's Form ADV, marketing brochures, newsletters, audited financial statements by GT Cayman and GT Ireland, NAV calculations calculated and approved by Circle Partners, and additional materials provided by TCA Management—in deciding to invest in the Master Fund, and, thereafter, in deciding not to withdraw those investments. (*Id.* ¶¶ 34-37.)

The Plaintiffs allege that certain of the individual officers and directors of GT Cayman, GT Ireland, and Circle Partners were aware that TCA Management failed to remove or properly value bad loans and created phantom "investment advisory" fees that were illusory and uncollectable, and that they helped TCA Management to cover this up. (*Id.* ¶¶ 49, 76-77, 96, 159.)

For example, internal emails from Circle Partners to TCA Management reveal that officers from Circle Partners would routinely ask officers at TCA Management if they were "comfortable" with the monthly NAV calculation, and, following that monthly check-in, would improperly alter the reported NAV based on unsupported feedback from certain members of TCA Management. (*Id.* ¶ 74.)

Additionally, an unreleased draft audit report from 2017 revealed that officers from GT Ireland and GT Cayman had knowledge of TCA Management's improper revenue recognition and reporting, inappropriate documentation for amounts receivable related to investment banking work as derivative assets and warrants, lack of audit evidence for loans and improper classification of loan performance and valuation of loans, lack of definite documentation as to repayment of note receivable by TCA Management, and improper and inadequate records maintenance and loan management systems. (*Id.* ¶ 49.) Despite this, GT Ireland, GT Cayman, and TCA Management worked in tandem to edit the draft so that the resulting final audit from 2017 downplayed or omitted these observations of mismanagement and overvaluation. (*Id.* ¶¶ 48-51.) The problems persisted into 2018 so much so that GT Ireland and GT Cayman felt they could not provide a favorable audit for TCA Management, and even threatened to issue an adverse opinion for the 2018 audit. (*Id.* ¶ 59.) In the end, no adverse opinion was issued because GT Ireland, GT Cayman, and TCA Management agreed on a plan by which additional third-party independent auditors were brought in to do audit work which GT Ireland and GT Cayman then certified and adopted for their own opinion, and which TCA Management provided to investors. (*Id.* ¶¶ 62-65.) The final 2018 audit

therefore downplayed or omitted the problems which had been previously identified in the 2017 draft audit and which were known to GT Ireland, GT Cayman, and TCA Management. (*Id.*)

The Plaintiffs maintain that because of the fraudulent monthly NAV reports from Circle Partners and the fraudulent yearly audits from GT Ireland and GT Cayman, investors were fed false information about the business model of the Master Fund and about the profit value of their investments. (*Id.* ¶¶ 88-89.) In a December 2019 newsletter to investors, TCA Management boasted of "35 months of straight profits touting over $500 million in assets under management and a 7.07% year to date return." (*Id.* ¶ 28.) Just one month later, three TCA employees would blow the whistle to the SEC, alleging these numbers were fabricated coverups of investor losses totaling more than $400 million. (*Id.* ¶ 29.) An SEC investigation began as the Funds collapsed and entered a dissolution process on or about January 21, 2020. (*Id.* ¶¶ 80-81.)

On May 11, 2020, the SEC filed a complaint in the Southern District of Florida against TCA Fund Management Group Corp., TCA Global Credit Fund GP, Ltd., TCA Global Credit Fund, LP., TCA Global Credit Fund, Ltd., and TCA Global Credit Master Fund, LP. (Am. Compl. ¶ 85-87, ECF No. 21; *SEC v. TCA Fund Mgmt. Corp.*, No. 1:20-cv-21964-CMA (S.D. Fla. Oct. 14, 2022).) Chief Judge Cecilia Altonaga issued an order in that case granting a motion for the appointment of a Receiver to take legal charge of all TCA assets. (*SEC v. TCA Fund Mgmt. Corp.*, No. 1:20-cv-21964-CMA, ECF No. 5 (S.D. Fla. May 11, 2020).) The order included a stay of litigation for "all civil legal proceedings of any nature" involving "the Receiver," "any Receivership Property" "any of the Receivership Entities including subsidiaries and partnerships," and "any of the Receivership Entities' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature." (*Id.*) The order stated that the parties to any such proceedings were enjoined from "commencing or continuing any such legal proceeding," from "taking any action, in connection with any such proceeding," and that all such proceedings were "stayed in their entirety" with "all courts having any jurisdiction thereof . . . enjoined from taking or permitting any action until further Order of this Court." (*Id.*)

Consequently, the parties involved in the present matter include only the investors (the Plaintiffs), the fund auditors (the GT Defendants), and the fund accountants (the Bolder Defendants), while the fund manager, the fund general partner, and the funds themselves (TCA Fund Management Group Corp.; TCA Global Credit Fund GP, Ltd.; and TCA Global Credit Fund, LP., TCA Global Credit Fund, Ltd., and TCA Global Credit Master Fund, LP.) are absent.

The Plaintiffs presently bring claims against GT Ireland, GT Cayman, Bolder USA and Bolder Cayman for negligent misrepresentation, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty for enabling TCA Management's overvaluation scheme via the audit and accounting work they performed for the Master Fund. The Plaintiffs do not allege that GTIL performed any work for the Master Fund. Rather, the Plaintiffs allege that GTIL is a principal, and GT Ireland and GT Cayman are its agents, thereby making GTIL liable for the others' acts and omissions. They raise the same three claims against GTIL under this agency theory.

The GT Defendants and the Bolder Defendants argue in their joint motion that this Court should dismiss the claims against them for the following reasons: (1) because the Plaintiffs are bound by valid forum selection clauses found in the Engagement Letters and Subscription Documents; (2) because this Court lacks personal jurisdiction over any of the Defendants in this matter; and alternatively (3) because pleadings are inadequate and are not made with sufficient specificity as is required to satisfy the heightened fraud pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure.

### 2. Legal Standards

### (A) Forum Non Conveniens

The "appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*." *Atl. Marine Const. Co. v. U.S. Dist. Court for the W. Dist. of Texas*, 571 U.S. 49, 60 (2013). Ordinarily, to obtain dismissal based on *forum non conveniens*, the moving party must demonstrate that "(1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice." *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1028 (11th Cir. 2014). In analyzing these factors, a court "must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff," *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004) (Altonaga, J.), but "may consider matters outside the pleadings." *Webster v. Royal Caribbean Cruises, Ltd.*, 124 F. Supp. 2d 1317, 1320 (S.D. Fla. 2000) (Gold, J.); *see also Atl. Marine*, 134 S. Ct. at 581 ("In the typical case not involving a forum-selection clause, a district court . . . must evaluate both the convenience of the parties and various public-interest considerations.").

"When faced with such a motion based on a valid forum-selection clause, however, the calculus is substantially adjusted to recognize that such a clause should be 'given controlling weight in all but the most exceptional cases.'"

*Turner v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 7:14–CV–1244–LSC, 2015 WL 225495, at *4 (N.D. Ala. Jan. 16, 2015) (quoting *Atl. Marine*, 134 S. Ct. at 581). "[T]he plaintiff's choice of forum merits no weight." *Atl. Marine*, 134 S. Ct. at 581. "Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.* Moreover, in evaluating a motion based on a forum-selection clause, a court should "not consider arguments about the parties' private interests." *Id.* at 582. "When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* "As a consequence, a district court may consider arguments about public-interest factors only." *Id.* Because "these factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual circumstances." *Id.*

### (B) Personal Jurisdiction

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer,* 556 F.3d 1260, 1274 (11th Cir. 2009). A defendant challenging personal jurisdiction must present evidence to counter the plaintiff's allegations. *Internet Sols. Corp. v. Marshall,* 557 F.3d 1293, 1295 (11th Cir. 2009). Once the defendant has presented sufficient evidence, "the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents." *Id.*

Florida's long-arm statute permits a court to exercise personal jurisdiction over a person who commits a tortious act within Florida. Fla. Stat. § 48.193(1)(a)(2) (2022).  This long-arm jurisdiction even extends to defendants who committed their tortious acts outside the state if their acts "cause injury in Florida." *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1216 (11th Cir.1999). For purposes of this analysis, copyright infringement is considered a tort. *Cf. BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271, 1278 (11th Cir. 2008) ("[C]opyright infringement is in the nature of a tort.").

After ensuring that it has personal jurisdiction over a particular defendant under the forum state's long-arm statute, a court must next ensure that invoking personal jurisdiction would not violate the defendant's Due Process rights. The Eleventh Circuit uses a three-part due process test:

(1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum;

(2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and

(3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice.

*Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (internal quotation marks omitted).

As to the first prong (*arising out of or relatedness*) a court should "focus on the direct causal relationship between the defendant, the forum, and the litigation." *Id.* at 1355–56. As to the second prong (*purposeful availment)* a court may apply the traditional *minimum-contacts test*, or, in intentional-tort cases, may utilize the *effects test.* "Under the 'effects test,' a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state." *Id.* at 1356 (citation omitted). "This occurs when the tort: (1) was intentional; (2) was aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Id.* (internal punctuation & citation omitted). As to the third prong (*fair play and substantial justice*) a court should "consider these factors: (1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the judicial system's interest in resolving the dispute." *Id.* at 1358 (quotation marks omitted).

### (C) Failure to State a Claim Upon Which Relief May Be Granted

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). A pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). A plaintiff must articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Thus, a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not survive dismissal. *See Twombly*, 550 U.S. at 555. "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

Yet, where the allegations "possess enough heft" to suggest a plausible entitlement to relief, the case may proceed. *See Twombly*, 550 U.S. at 557. "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008). "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556.

Where a cause of action sounds in fraud, however, Federal Rule of Civil Procedure 9(b) must be satisfied in addition to the more relaxed standard of Rule 8. Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake," although "conditions of a person's mind," such as malice, intent, and knowledge, may be alleged generally. Fed. R. Civ. P. 9(b). "The 'particularity' requirement serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008) (citations omitted). "When a plaintiff does not specifically plead the minimum elements of their allegation, it enables them to learn the complaint's bare essentials through discovery and may needlessly harm a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, [grounded on] baseless allegations used to extract settlements." *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 n.24 (11th Cir. 2002). Thus, the Rule's "particularity" requirement is not satisfied by "conclusory allegations that certain statements were fraudulent; it requires that a complaint plead facts giving rise to an inference of fraud." *W. Coast Roofing & Waterproofing*, 287 F. App'x at 86. To meet this standard, the complaint needs to identify the precise statements, documents, or misrepresentations made; the time and place of, and the persons responsible for, the alleged statements; the content and manner in which the

statements misled the plaintiff; and what the defendant gained through the alleged fraud. *Id.*

### 3. Analysis

The Court first addresses the validity and enforceability of the forum selection clauses raised by the Defendants, concluding that the Bolder Defendants are the only entities entitled to dismissal under a forum non conveniens analysis. The Court next addresses personal jurisdiction over the GT Defendants, finding that it may exercise personal jurisdiction over GT Cayman and GT Ireland. Finally, the Court addresses the adequacy of the pleadings against GT Cayman and GT Ireland, determining the claims against those Defendants to be sufficiently pleaded and to state claims upon which relief may be granted.

### A. Forum Selection Clauses

First, the Court addresses the Defendants' arguments that the Plaintiffs' claims are subject to forum selection clauses requiring litigation in the Cayman Islands. The Court finds that the Plaintiffs' claims against the Bolder Defendants must be litigated in the Cayman Islands based on the Subscription Documents' forum selection clause, but the Plaintiffs' claims against the GT Defendants are not subject to any forum selection clause.

### (1) The Plaintiffs and the Bolder Defendants are bound by the subscription documents' valid, enforceable, and mandatory forum selection clause.

"Forum selection clauses are presumptively valid and enforceable." *Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009). Here, each subscriber to the TCA Global Credit Fund, LP, including the Plaintiff Todd Benjamin, received and signed subscription documents with the following choice of law provision and forum selection clause: "The Subscription Agreement will be governed by and construed in accordance with the laws of the Cayman Islands, without regard to conflict of laws principles. The Subscriber submits to the exclusive jurisdiction of the Cayman Islands courts with respect to any actions against the Partnership, the General Partner, the Investment Manager and the Administrator." (ECF No. 58-1 at 3.)

"In order to bind a non-party to a forum selection clause, the party must be closely related to the dispute such that it becomes foreseeable that it will be bound." *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998) (quotation marks and citations omitted). A sufficiently close

relationship to enforce a forum selection clause against a non-party can be found when "the non-party is an alter-ego of the signatory, a successor entity to the signatory or is owned or primarily owned by the signatory." *Maale v. Kirchgessner*, No. 08-80131-CIV, 2011 WL 1565912, at *10 (S.D. Fla. Feb. 18, 2011) (Snow, Mag. J.) (quoting *Sealord Marine Co. Ltd. v. American Bureau of Shipping,* 220 F. Supp. 2d 260, 270 (S.D.N.Y.2002) (internal citations omitted)), *report and recommendation adopted in part and overruled in part, Maale v. Kirchgessner,* No. No. 08-80131-CIV, 2011 WL 1549058, at *6 (S.D. Fla. Apr. 22, 2011) (Dimitrouleas, J.).

The Plaintiffs argue that the mandatory forum selection clause should apply exclusively to Bolder Cayman because its predecessor, Circle Cayman, was the sole "express third-party beneficiary." (ECF No. 68 at 28.) However, the Plaintiffs fail to distinguish between Circle Cayman and Circle USA in their own complaint, treating the two entities as one joint operation. The pleadings state that "Circle Partners became the fund administrator to the Feeder Funds and Master Fund in 2014 after an acquisition of its predecessor-in-interest in August 2014." (ECF No. 21 ¶70.) After defining "Circle Partners" as "Bolder Cayman, and together with Bolder USA" on the first page of the First Amended Complaint, the Plaintiffs address "Circle Partners" without distinguishing between the USA and the Cayman branches. (*Id.* ¶18.) The Complaint refers repeatedly and only to "Circle Partners" because during the relevant time period, the services were provided by both of the Circle entities (rather than their Bolder successors.) (ECF No. 21 at 3 n.1.)

The Subscription Document also identifies "Circle Partners" generally as the Funds' "Administrator." (ECF No. 58-1 at 3, 7.) The address provided on the Subscription Documents reflects a Circle Partners office located in the Cayman Islands. (*Id.*) And the Plaintiffs never dispute that Circle USA and Circle Cayman were predecessors to Bolder USA and Bolder Cayman, respectively.

Based on the Plaintiffs' own language, then, the court finds a sufficiently "close relationship," analogous to an alter-ego relationship, between Circle USA and Circle Cayman—and therefore between Bolder USA and Bolder Cayman—to apply the forum selection clause to both entities. *See Maale*, 2011 WL 1565912, at *10. Accordingly, the forum selection clause applies to both of the Bolder Defendants as successor entities to the Funds' Administrator.

**(2) The forum selection clause requires the dismissal of the Bolder Defendants under a forum non conveniens analysis.**

Because the Court finds that the forum-selection clause is valid and enforceable as to both the Bolder Defendants, the modified analysis in *Atlantic*

*Marine* applies.[1] 571 U.S. at 62. The first part of this analysis requires the Court to determine whether an adequate alternative forum exists. *McArthur v. Kerzner Int'l Bahamas Ltd.,* 607 F. App'x 845, 848 (11th Cir. 2015); *see also Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1310–11 (11th Cir. 2001). To be available, a foreign forum must be able to assert jurisdiction over the matter whose transfer is sought. *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 578 F.3d 1283, 1289–90 (11th Cir. 2009); *abrogated on other grounds by Fresh Results, LLC v. ASF Holland, B.V.*, 921 F.3d 1043, 1049-53 (11th Cir. 2019). A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255 n. 22 (1981). Here, the Bolder defendants consented to jurisdiction in the Cayman Islands, an adequate alternative forum with the ability to provide relief for the Plaintiffs. *See Tradex Glob. Master Fund SPC Ltd. v. Palm Beach Cap. Mgmt., LLC*, No. 09-21622-CIV, 2010 WL 717686, at *7 (S.D. Fla. Mar. 1, 2010) (Moreno, J.). Accordingly, the Court finds that Cayman Islands is both available and adequate as an alternative forum.

The Court notes that the private factors under the *Atlantic Marine* analysis are deemed to weigh in favor of dismissal. A court evaluating a defendant's forum non conveniens motion based on a forum-selection clause "should not consider arguments about the parties' private interest" because "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Atl. Marine*, 571 U.S. at 64. "A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Id.*

Next, the Court must consider the relevant public interest factors to determine whether dismissal is appropriate. The public interest factors to be considered include: "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; [and] the avoidance of unnecessary problems in conflicts of law, or in the application of foreign law." *Piper Aircraft*, 454 U.S. at 241 n.6; *Pierre-Louis v. Newvac Corp.*, 584 F.3d 1052, 1056 (11th Cir. 2009).

First, the Court considers whether administrative difficulties flowing from court congestion weigh in favor of dismissal. The Court notes that the Southern District of Florida has one of the busiest dockets in the country, and this factor

---

[1] No party disputes the validity of the forum selection clause.

therefore weighs in favor of dismissal. Nonetheless, this factor generally does not warrant significant consideration in the forum non conveniens analysis, and the Court does not accord it much weight. *See Morse v. Sun Int'l Hotels Ltd.,* No. 98–7451–Civ, 2001 WL 34874967, at *6 (S.D. Fla., Feb. 26, 2001) (Jordan, J.).

Second, the Court finds that the local interest in adjudicating this controversy weighs in favor of dismissal and litigation in the Cayman Islands. The Court first acknowledges the proposition that a general interest exists in allowing United States citizens to bring suit in a United States court. *See SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101–02 (11th Cir. 2004). Mr. Benjamin is a United States citizen and a resident of the United Kingdom. However, the services provided by the Bolder Defendants were performed for entities located in the Cayman Islands. Relevant public factors include "the familiarity of the court(s) with the governing law, the interest of any foreign nation in having the dispute litigated in its own courts, and the value of having local controversies litigated locally." *Vanderham v. Brookfield Asset Mgmt., Inc.,* 102 F. Supp. 3d 1315, 1320 (S.D. Fla. 2015) (Moore, J.) (quoting *Pierre–Louis*, 584 F.3d at 1056). Accordingly, due to the valid and enforceable forum selection clause that grants the Cayman Islands exclusive jurisdiction, paired with the choice of law provision that specifies Cayman Islands law as controlling, the Court finds the public considerations weigh in favor dismissal to the Cayman Islands. *Id.*

Third, Cayman Islands law governs the action because the Plaintiffs signed an enforceable choice of law provision that governs this claim. *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours and Co.*, 761 So. 2d 306, 311 (Fla. 2000) ("Generally, Florida enforces choice-of-law provisions unless the law of the chosen forum contravenes strong public policy."). Therefore, this factor also weighs in favor of dismissal.

Finally, the Court concludes that dismissal is appropriate because the Plaintiffs can reinstate their lawsuit in the Cayman Islands without undue inconvenience or prejudice. *See Leon*, 251 F.3d at 1310-11. The Bolder Defendants have specifically consented to Cayman Islands jurisdiction. (ECF No. 82 at 28.)

Thus, the Plaintiffs have failed to sufficiently carry their burden to overcome the "practical result . . . that forum-selection clauses should control except in unusual circumstances." *Atl. Marine*, 571 U.S. at 63-64. Accordingly, under the forum non conveniens analysis articulated in *Atlantic Marine*, the Court finds this case should be dismissed with respect to the Bolder Defendants.

**(3) The engagement letters' forum selection clause cannot be enforced by the GT Defendants against the non-signatory Plaintiffs.**

The GT Defendants claim that the forum selection clause contained in the Engagement Letters, which specifies Cayman Islands jurisdiction as exclusive, shields them from the present suit brought in the Southern District of Florida. (ECF No. 58 at 28-30.) The Engagement Letters were signed by GT Ireland, GT Cayman, and TCA Global Credit Fund, Ltd. and described the auditing services to be performed. (ECF 58-4 at 59). The Plaintiffs were not signatories or parties to the Engagement Letters, and GT is attempting to enforce the clause against the Plaintiffs based on their close relationship to the present dispute. (ECF No. 58 at 38-40.)

"In order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998) (quoting *Manetti–Farrow, Inc. v. Gucci Am., Inc.,* 858 F.2d 509, 514 n.5 (9th Cir.1988)). Courts have bound a non-party to a forum selection clause when the non-party's interests are "completely derivative" of those of a party to an agreement, and thus "directly related to, if not predicated upon" the interests of the parties. *Id.*

As stated above, to enforce a forum selection clause against a non-party, the court must find a close relationship analogous to alter-ego entities, successorship, or primary to complete ownership. *Maale*, 2011 WL 1565912 at *10. Unlike these close relationships, here, the Defendants have failed to demonstrate how the Plaintiffs are so closely related to the relationship between the Funds and the GT Defendants memorialized by the Engagement Letters. The Plaintiffs simply invested in the Fund; they are not alter-egos of, successors of, nor primarily owned by any of the parties to the Engagement Letters. *Id.* Therefore, the Engagement Letters' forum selection clause is inapplicable to the Plaintiffs.

**(4) The Subscription Documents' forum selection clause cannot be enforced by the non-signatory GT Defendants against the Plaintiffs.**

Alternatively, the Defendants argue that the GT Defendants are sufficiently related to the entities expressly named in the Subscription Documents to enforce its forum selection clause against the Plaintiffs. (ECF No. 58 at 30-31.)

In a similar investment fraud case, *Tradex Global Master Fund SPC Ltd v. Palm Beach Capital Management LLC*, this Court considered whether a forum selection clause should apply to a fund administrator, Admiral, that was not a signatory to the Subscription Agreement. Accordingly, we conclude that the absence of Offshore's signature on the Subscription Agreements does not render the forum selection clause unenforceable. No. 09-21622-CIV, 2009 WL 10644816, at *5 (S.D. Fla. Dec. 4, 2009) (Torres, Mag. J.), *report and recommendation adopted sub nom. Tradex Glob. Master Fund SPC Ltd. v. Palm Beach Cap. Mgmt., LLC*, No. 09-21622-CIV, 2010 WL 11442204 (S.D. Fla. Mar. 1, 2010) (Moreno, J.). In holding that the administrator was entitled to enjoy the benefits of the clause, the Court reasoned that because the Subscription Agreements expressly named Admiral as the administrator and deemed Admiral the Subscriber's agent, it was clearly foreseeable that Admiral would enforce the forum selection clause. *Id.*

Here, "Grant Thornton" was never mentioned in the Subscription Documents signed by the Plaintiffs. (ECF No. 58-1 at 6-11, 14.) Further, the GT Defendants do not point to—and the Court cannot find—any portion of the Subscription Documents that make even an oblique reference to the GT Defendants, auditors, or other third-party entities that would support the GT Defendants' foreseeable enforcement of the forum selection clause. (ECF No. 58-1 at 6-11.) The Court therefore finds that it was not foreseeable to the Plaintiffs that the GT Defendants, the independent auditors, could invoke the forum selection clause contained in the agreement made between the Plaintiffs and the Funds. *See Tradex*, 2009 WL 10644816, at *4.

### (5) The Plaintiffs cannot be subject to the Engagement Letters' forum selection clause through equitable estoppel.

Finally, the GT Defendants argue that because the Plaintiffs' claims are based on the audit services performed pursuant to the Engagement Letter, they are equitably estopped from rejecting its forum selection clause. However, "equitable estoppel allows a nonsignatory to enforce the provisions of a contract against a **_signatory_** in two circumstances: (1) when the signatory to the contract relies on the terms of the contract to assert his or her claims against the nonsignatory; and (2) when the signatory raises allegations of interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012) (emphasis added). Because the Plaintiffs were not signatories to the Engagement Letters, this argument fails.

### B. Personal Jurisdiction

With Defendants Bolder USA and Bolder Cayman dismissed based on the Subscription Documents' forum selection clause, the Court must determine whether it may exercise personal jurisdiction over the GT Defendants. The Court finds that it may exercise personal jurisdiction over GT Cayman and GT Ireland, but it lacks personal jurisdiction over GTIL.

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Mazer*, 556 F.3d at 1274. A defendant challenging personal jurisdiction must present evidence to counter the plaintiff's allegations. *See Marshall*, 557 F.3d at 1295. Once the defendant has presented sufficient evidence, "the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents." *Id.* Each step must be analyzed first to ensure comportment with the Florida long-arm statute, and second, to ensure the exercise of jurisdiction comports with the 14th Amendment's Due Process clause. See *Louis Vuitton*, 736 F.3d at 1350.

As explained below, this Court has personal jurisdiction over GT Cayman and GT Ireland. GT Cayman and GT Ireland committed are alleged to have committed acts placing them within the purview of the Florida long-arm statute. They also had sufficient minimum contacts with Florida such that due process is not offended: they purposefully availed themselves of the privilege of Florida's laws, so the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. This Court does not have personal jurisdiction over GTIL, however. Because GTIL had no contacts with the state of Florida or with the Plaintiffs in this matter, it can only be held liable under the theory that GT Cayman and GT Ireland are agents acting on behalf of GTIL, and the Plaintiffs' own pleadings in this matter bely the existence or even the appearance of such an agency relationship here.

### (1) GT Cayman and GT Ireland's communications into Florida satisfy the long-arm statute and the Due Process Clause.

Under Florida's long-arm statute, a nonresident defendant who commits a tortious act in Florida submits itself to the jurisdiction of Florida's courts. See Fla. Stat. § 48.193(1)(a)(2) (2022). The defendant need not be physically present in the state for the tort to be committed in Florida, so long as the tort arises from telephonic, electronic, or written communications made by the nonresident defendant into the state of Florida. *Kiem v. ADF MidAtlantic, LLC*, 199 F. Supp. 3d 1362, 1367 (S.D. Fla. 2016) (Marra, J.); *Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002). To satisfy the "arising out of" requirement, it

must be the case that the cause of action for the tort "would depend upon proof of either the existence or the content of" the communications into Florida. *Carlyle v. Palm Beach Polo Holdings*, 842 So. 2d 1013, 1017 (Fla. 4th DCA 2003).

Once the requirements of the long-arm statute are met, the Court must engage in a due process analysis. The inquiry focuses on the defendant's contacts with the state, and not the "random, fortuitous, or attenuated" contacts it has by interacting with other persons affiliated with the state. *Walden v. Fiore*, 571 U.S. 277, 284, (2014).

Here, GT Cayman and GT Ireland's actions in the state and communications into the state satisfy both the requirements of the Florida long-arm statute and the requirements of Due Process for personal jurisdiction. GT Cayman and GT Ireland began communicating via email with TCA Management representatives in Florida in December of 2017. Representatives from GT Cayman and GT Ireland met in Florida with representatives from TCA Management over two days in January of 2018 to agree on terms for the audit work. They then executed written Engagement Letters solidifying these terms. Thereafter they made numerous telephonic and electronic written communications via email into Florida throughout the course of 2018 and continuing into 2019, all in connection with the audit work performed for the Funds.

While GT Cayman and GT Ireland attempt in their motion to downplay these in-person meetings, numerous phone calls, and numerous emails as unrelated and peripheral to the audit work performed for the Funds, this Court disagrees. The numerous calls and emails into Florida are sufficient evidence to support the Plaintiff's allegations that personal jurisdiction via Florida's long-arm statute exists here. (Am. Compl. ¶¶ 41-69; ECF No. 69-1 ¶ 7, Exs. 2-32.) GT Cayman and GT Ireland communicated with Florida residents (representatives of TCA Management) in the state of Florida. From those numerous communications arise each of the present causes of actions against them. Taking the Plaintiff's allegations as true, and supported by the jurisdictional declaration of Jonathan Perlman and exhibits the Plaintiffs submitted in response to the Defendants' motion, nonresident defendants GT Cayman and GT Ireland subjected themselves to Florida's jurisdiction when they committed tortious acts within the state of Florida by means of telephonic and electronic communication into the state. (Am. Compl. ¶¶ 41-69; ECF No. 69-1 ¶ 7, Exs. 2-32.)

Moreover, these communications satisfy the sufficient minimum contact threshold indicating purposeful availment by GT Cayman and GT Ireland of the laws of the state of Florida. The Plaintiffs' claims arise out of the GT Cayman

and GT Ireland's minimum contacts with TCA Management representatives, who were located in Florida when they received the communications. In their joint motion to dismiss, the GT Defendants argue they did not "aim or target Florida" with their actions, but this obfuscates the fact that every meeting held in Florida, every phone call made to TCA Management in Florida, and every email sent to TCA Management in Florida was an act targeting Florida or Floridian individuals for the purposes of conducting mutually profitable business with a Florida corporation. (Am. Compl. ¶¶ 41-69; ECF No. 69-1 ¶ 7, Exs. 2-32.); *Kiem*, 199 F. Supp. 3d at 1370. Given that GT Cayman and GT Ireland did target their contacts toward a Florida business and its Floridian officers, they could reasonably anticipate being hailed into court in Floridian jurisdiction in connection with those contacts. *Kiem*, 199 F. Supp. 3d at 1370.

Finally, this Court is not convinced that the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. The burden on these defendants is not unreasonable, given their purposeful availment of the privilege of conducting business within the state, given that they have traveled to Florida before, and given the advances to modern transportation and communication. *Luis Vuitton*, 736 F.3d at 1358. Florida has an interest in adjudicating disputes like this wherein Floridian companies like TCA Management orchestrate fraud schemes resulting in losses to hundreds of investors. *Id.* And it is not clear to this Court that litigating in Florida would negatively affect the interests of other states in furthering shared policies, or that another forum would be a better use of judicial resources. *Id.*

For these reasons, the Court finds there is specific personal jurisdiction over GT Cayman and GT Ireland.

### (2) Agency-based personal jurisdiction cannot be imputed to GTIL based upon its relationship with GT Cayman and GT Ireland.

The Plaintiffs argue that personal jurisdiction can be exercised over GTIL, an entity incorporated and headquartered in the United Kingdom, based on its agency relationship with "member firms" GT Cayman and GT Ireland. (ECF No. 21 ¶ 3.) The Motion to Dismiss argues that the Plaintiffs fail to establish an agency relationship that would allow the imputation of jurisdiction to GTIL. (ECF No. 58 at 18-22.) The Court agrees with the arguments laid out in the motion.

"Agency-based personal jurisdiction exists where the parent entity exercises operational control over a subsidiary." *Hard Candy, LLC v. Hard Candy Fitness, LLC*, 106 F. Supp. 3d 1231, 1241 (S.D. Fla. 2015) (Altonaga, J.). "Operational control" means "the day-to-day control of the internal affairs or basic operations of the subsidiary." *Id.* (citing *Enic, PLC v. F.F. South & Co.,* 870

So.2d 888, 891–92 (Fla. 5th DCA 2004)). Without such a high degree of control, jurisdictional contracts will not be imputed, even when the entities have "a very close working relationship" and "regular and extensive contact." *Gen. Cigar Holdings, Inc. v. Altadis, S.A.,* 205 F. Supp. 2d 1335, 1343–44 (S.D. Fla. 2002) (Moreno, J.), *aff'd* 54 F. App'x. 492 (11th Cir. 2002). Jurisdiction can also be imputed based on agency when the subsidiary has no independent purpose besides conducting business for the parent. *See Hard Candy, LLC,* 106 F. Supp. 3d at 1241. Even if the parent "approves major policy decisions" and "establishes the subsidiary's goals and directives," this alone is insufficient to find an agency relationship sufficient to impute personal jurisdiction. *Id.*

The Defendants provided a declaration by Sumanjeet Parmar, the Finance Director for GTIL. Parmar states that GTIL, GT Cayman, and GT Ireland each have the following distinctions: separate principal places of business; no officers or directors in common; separate accounting systems, bank accounts, addresses, telephone numbers, fax numbers, and email addresses; no property owned in common; and distinct employee benefit plans. Further, Parmar states, "all member firms, including GT Cayman and GT Ireland, are responsible for accepting and choosing their own engagements, clients, and partners." (ECF No. 58-5 at 8.) These facts demonstrate that there is no agency relationship between GTIL and its member firms sufficient to impute personal jurisdiction.

Most importantly, however, an exhibit provided in the Plaintiffs' own opposition to the Defendants' Motion to Dismiss undermines their agency argument. Exhibit 3 to Mr. Perlman's jurisdictional declaration, a document titled "Proposal to provide fund audit services," is dated December 12, 2017 and signed by Greg O'Driscoll, the Partner & Head of Funds for GT Cayman. The final slide of the presentation states that "Grant Thornton International Ltd (GTIL) and the member firms are not a worldwide partnership. GTIL and each member firm is a separate legal entity. Services are delivered by the member firms. GTIL does not provide services to clients. **GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions**." (ECF No. 69-3 at 11 (emphasis added).) Based on this presentation, the Plaintiffs clearly could not have had any apparent belief that an agency relationship existed between GTIL and its member firms.

In the absence of any direct jurisdictional allegations against Defendant GTIL, and in light of the jurisdictional evidence presented that demonstrates a lack of both actual and apparent agency relationships between GTIL and GT Cayman and GT Ireland, the Court must dismiss GTIL for lack of personal jurisdiction.

### C. Failure to State a Claim

With Defendants Bolder USA, Bolder Cayman, and GTIL dismissed from this case, the Court must now address the sufficiency of the amended complaint's allegations against GT Cayman and GT Ireland. The Court finds that each claim against these Defendants is pleaded with the requisite specificity under Federal Rule of Civil Procedure 9(b). Therefore, the Court declines to dismiss the Plaintiffs' claims against GT Cayman and GT Ireland.

### (1) The Plaintiffs adequately allege intent to plead a claim for negligent misrepresentation against GT Cayman and GT Ireland

The Defendants argue that the Plaintiffs fail to plead any of the necessary elements of this claim for negligent misrepresentation (Count I) against GT Cayman and GT Ireland with specificity, and that the claim fails to plead the requisite intent. (Mot. Dismiss at 34-35.) The Plaintiffs counter that the Defendants do not point to the correct standard for negligent misrepresentation, and the Plaintiffs have sufficiently pleaded the actual elements of the claim. (Resp. at 37-38.)

The Plaintiffs are correct. First, intent to deceive is not a requirement to plead negligent misrepresentation. "The Restatement, quoted with approval in *Gilchrist Timber Co.,* 696 So.2d at 337, identifies negligent representation, as distinguished from fraudulent representation, as 'when there is no intent to deceive but only good faith coupled with negligence.'" *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 127 F.3d 1390, 1395 (11th Cir. 1997) (quoting *Restatement (Second) of Torts* § 552 cmt. a.) (cleaned up); a*ccord Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 339 (Fla. 1997) ("By this opinion, we adopt the Restatement (Second) of Torts' position on negligent misrepresentation contained in section 552."). Rather, "[t]he knowledge element of negligent misrepresentation is satisfied when the representer 'made the representation without knowledge of its truth or falsity or should have known the representation was false.'" *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 127 F.3d 1390, 1395 (11th Cir. 1997).

Second, the Plaintiffs plead sufficiently specific facts to demonstrate that the elements of negligent misrepresentation have been met here. The Plaintiffs must plead the following elements:

(1) a misrepresentation of material fact that the defendant believed to be true but was in fact false; (2) that defendant should have known the representation was false; (3) the defendant intended to induce the

plaintiff to rely on the misrepresentation; and (4) the plaintiff acted in justifiable reliance upon the misrepresentation, resulting in injury.

*Hercules Cap., Inc. v. Gittleman*, No. 16-CV-81663, 2018 WL 395489, at \*21 (S.D. Fla. Jan. 12, 2018) (Middlebrooks, J.) (quoting *Arlington Pebble Creek, LLC v. Campus Edge Condo. Ass'n, Inc.*, 232 So. 3d 502, 505 (Fla. 1st DCA 2017)). They must plead these elements with specificity because "[h]istorically, in Florida an action for negligent misrepresentation sounds in fraud rather than negligence." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1128 (11th Cir. 2019) (citation omitted).

But, as the Plaintiffs correctly observe, "it is the law of this Circuit that Rule 9(b)'s heightened pleading standard may be relaxed in instances such as these where the facts of the alleged fraud are peculiarly within the Defendants' knowledge." *Noboa v. Castillo*, 21-23952-CIV, 2022 WL 2191687, at \*5 (S.D. Fla. June 17, 2022) (Scola, J.). Additionally, "Rule 9(b)'s requirements may be relaxed for allegations of prolonged, multi-act schemes." *Fla. Emergency Physicians Kang & Assocs., M.D., Inc. v. United Healthcare of Fla., Inc.*, 526 F. Supp. 3d 1282, 1295 (S.D. Fla. 2021) (Dimitrouleas, J.) (citing *Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 622 (11th Cir. 2015)). Accordingly, while the Court must apply Rule 9(b) pleading standards, those standards are relaxed here where the information supporting those claims would be uniquely within GT Cayman's and GT Ireland's control, and where the scheme alleged is especially complex.

Viewed with these standards in mind, the Plaintiffs undoubtedly meet Rule 9(b)'s requirements in pleading their negligent misrepresentation claim. They plead specific misrepresentations in accounting, which are listed both in the main body of the complaint and again in Count I. (Am. Compl. ¶¶ 92, 121.) They plead factual reasons why, based on their accounting work, GT Cayman and GT Ireland should have known those misrepresentations to be false (and on this particular allegation, Rule 9(b)'s requirements are at their most "relaxed" in this Circuit). (*Id.* ¶¶ 57-58, 66, 122). And they plead facts demonstrating that GT Cayman and GT Ireland's accounting work was intended to induce and did, in fact, induce the Plaintiff's justifiable reliance. (*Id.* ¶ 96.) Again, where this information regarding intent to induce reliance would be "peculiarly within" GT Cayman's and GT Ireland's knowledge, the Plaintiffs may allege that intent more generally. *Noboa*, 2022 WL 2191687, at \*5. Certainly, the remainder of the Plaintiffs' pleadings demonstrate that the inference of knowledge and intent to induce is reasonable here. *Id.* ("Accepting these allegations as true and construing them in the light most favorable to

[the plaintiff], the Court finds that his allegations give rise to reasonable inferences of knowledge and intent that make his claims plausible.").

Therefore, the Court finds Count I, for negligent misrepresentation, to comply with Rule 9(b)'s pleading requirements and to sufficiently state a plausible claim upon which relief may be granted.

> **(2) The Plaintiffs allege their claims for aiding and abetting breach of fiduciary duty and fraud against GT Cayman and GT Ireland with sufficient specificity.**

The Defendants also argue that both Count II (aiding and abetting breach of fiduciary duty) and Count III (aiding and abetting fraud) fail to meet Rule 9(b)'s specify requirements. (Mot. Dismiss at 33-34.) The Plaintiffs argue in response that the Defendants overstate Rule 9(b)'s pleading requirements and that they plead sufficient specific facts for each of the elements, at any rate. (Resp. at 34-35.)

A plaintiff alleging aiding and abetting breach of fiduciary duty or fraud under Florida law must plead "(1) an underlying violation on the part of the primary wrongdoer, (2) knowledge of the underlying violation by the aider and abettor, and (3) the rendering of substantial assistance to the wrongdoer by the aider and abettor." *Gevaerts v. TD Bank, N.A.*, 56 F. Supp. 3d 1335, 1341 (S.D. Fla. 2014) (Rosenberg, J.). The elements are the same for both claims. *Lamm v. State St. Bank & Tr. Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012) (Ryskamp, J.), *aff'd sub nom. Lamm v. State St. Bank & Tr.*, 749 F.3d 938 (11th Cir. 2014). "While the element of actual knowledge may be alleged generally, the plaintiff still must accompany that general allegation with allegations of specific facts that give rise to a strong inference of actual knowledge regarding the underlying fraud." *Id.* (cleaned up). "Substantial assistance occurs when a defendant affirmatively assists, helps conceal, or fails to act when required to do so, thereby enabling the breach to occur." *Gevaerts*, 56 F. Supp. 3d at 1342.

The Plaintiffs plead sufficient, specific facts to demonstrate an underlying violation (both of fraud and fiduciary duty) by TCA Management. (Am. Compl. ¶¶ 17, 91, 99, 134-35, 141. 159-60, 166.) The Court need not recount details of each allegation supporting TCA Management's malfeasance at this point; it has done so more than sufficiently above. The Plaintiffs also plead sufficient, specific facts identifying the substantial assistance that GT Cayman and GT Ireland provided to cover up TCA Management's malfeasance by failing to identify known issues in their audit reports and other accounting work. (*Id.* ¶¶ 17, 42-69, 91.) Having reviewed these specific allegations as a whole, the facts of this case clearly demonstrate "a strong inference of actual knowledge" on the part of GT Cayman and GT Ireland. *Lamm*, 889 F. Supp. 2d at 1332.

Accordingly, the Plaintiffs' more general allegations of knowledge suffice. (Am. Compl. ¶¶ 90, 134-35, 140-41.)

### 4. Conclusion

For the reasons stated above, the Court **grants in part** and **denies in part** the Defendants' motion to dismiss the amended complaint. (**ECF No. 58**.) The Court **dismisses** the Plaintiffs' claims against Defendants Bolder Fund Services (USA), LLC, and Bolder Fund Services (Cayman), Ltd. for *forum non conveniens*, albeit **without prejudice**. The Court **dismisses** the Plaintiffs' claims against Defendant Grant Thornton International Ltd. for lack of personal jurisdiction, albeit **without prejudice**. The Court otherwise **denies** the Defendants' motion to dismiss.

**Done and ordered** at Miami, Florida, on July 11, 2023.

Robert N. Scola, Jr.
United States District Judge